Barbara C. **FREEDMAN**, Plaintiff,

v.

Thomas D. **BARROW** et al., **Defendants.**

**No. 75 Civ. 4737.**

United States District Court,
S. D. New York.

Nov. 4, 1976.

Stephen Lowey, and Richard B. Dannenberg, Lipper, Lowey & Dannenberg and Burton L. Knapp, New York City, for plaintiff.

Roy H. Steyer, David Olasov, Margaret K. Pfeiffer, Sullivan & Cromwell, New York City, for defendant Exxon Corp.

White & Case, New York City, for defendants Franklin, Long, MacNaughton & Peterson.

Robert Clare, Werner L. Polak and Clarence W. Olmstead, Jr., of Shearman & Sterling, New York City, for the remaining individual defendants.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

This action was tried before me on June 25, 28, 29, 30 and July 1, 1976, without a jury. Post-trial briefs and proposed findings of fact and conclusions of law have been submitted and considered. What follows, together with the formal numbered findings being filed simultaneously herewith, to the extent not inconsistent, and the stipulated facts docketed June 24, 1976, constitute the Court's findings and conclusions.

Since 1967, plaintiff Barbara C. Freedman, a citizen of New York, has owned at least 32 shares of common stock of defendant Exxon Corporation, formerly Standard Oil Company (New Jersey), hereinafter "Exxon", out of approximately 224,268,760 shares outstanding on May 17, 1973 ("the meeting date"). The named defendants in addition to Exxon are now or were officers and directors of Exxon.

Plaintiff sues derivatively on behalf of Exxon, claiming in Count One that the individual defendants violated Section 14(a) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, promulgated thereunder by the Securities and Exchange Commission ("SEC"), by soliciting proxies

for the May 17, 1973 annual meeting of Exxon, by a Proxy Statement which contained untrue statements of material fact and omitted to state material facts. Plaintiff further contends in Count Two that some of the defendants violated Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), by making short-swing profits through the exercise of "stock appreciation rights" (SARs), described below, granted to them by Exxon pursuant to the terms of the 1973 Incentive Program authorized at the meeting. Finally plaintiff asserts in Count Three that the grant of SAR's, and the extension of the life of certain existing qualified stock options after the meeting, was without any consideration flowing to Exxon, and therefore violated applicable state corporation laws forbidding waste, or gifts of corporate assets. Exxon is a New Jersey corporation having its principal office in this District.

This Court has subject matter jurisdiction of this action pursuant to § 27 of the 1934 Act, 15 U.S.C. § 78aa, and principles of pendent jurisdiction. Plaintiff has the capacity and standing to bring this derivative action on behalf of Exxon. Although she made no demand on Exxon's Board of Directors to sue, I find such a request would be a futile and useless act. *Berkwich v. Mencher*, 239 F.Supp. 792 (S.D.N.Y.1965).

Exxon and its more than 400 subsidiaries and affiliated companies conduct a substantial business in the United States and in more than one hundred other countries throughout the world. Directly, and through its affiliates, it is engaged principally in the exploration and production of crude oil and natural gas from lands owned, leased or held under concession; and in the extraction, refining, transportation and marketing of petroleum products and petrochemicals. At all relevant times the common stock of Exxon has been registered under § 12 of the 1934 Act, and has been listed and traded on the New York Stock Exchange.

■ The individual named Exxon management defendants may be classified in the following categories: Messrs. Barrow, Campbell, Jr., Cox, Garvin, Kauffmann, Piercy and Milbrath are presently or were at the time of trial, officers and directors of Exxon. Mr. Jamieson was Chairman of the Board and Chief Executive Officer of Exxon, until his retirement as an employee on July 31, 1975. He continues to serve as an "annuitant director." Messrs. Collado, Vazquez and Wright are former directors and officers of Exxon. Messrs. Anderson, Holloway, Peyton and Baze are or were at the time of trial, officers of Exxon. Messrs. Franklin, Learson, Long, MacNaughton and Peterson are, or were, so-called "outside" or non-employee directors of Exxon.[1]

The specific positions and titles, and relevant time periods concerning the individual defendants are set forth in the Stipulated Facts, pp. 3–9.

*Factual Background of the Controversy.*

On May 15, 1968, by proceedings not questioned here, Exxon's shareholders approved and adopted the 1968 Incentive Program. That program was intended to replace the 1964 Incentive Program, and was to continue for five years from June 1, 1968 until May 31, 1973.

On May 17, 1973, just two weeks prior to the expiration of the 1968 Program, the shareholders approved the 1973 Incentive Program, which also had a five year term, extending from June 1, 1973 until May 31, 1978. This vote was solicited and obtained pursuant to the Proxy Statement which is claimed to be false and misleading.

While most of the basic concepts in these two programs had developed out of earlier

---

1. Defendants Learson and Milbrath were never served with process in this action, and did not appear generally. As to them, the action shall be dismissed for want of personal jurisdiction and failure to prosecute. On June 24, 1976, one day before trial, the Amended Complaint was dismissed as against defendants Franklin, Long, MacNaughton and Peterson, with prejudice, except as to the third count, which was dismissed without prejudice to plaintiff's allegations in an action now pending in the Supreme Court of the State of New York entitled *Shaw v. Jamieson, et al.*, App.Div., 390 N.Y. S.2d 111.

executive incentive plans, it is the 1968 and 1973 Programs which are the focal points of plaintiff's claims, for the acts complained of were carried out pursuant to those two Programs. It is to the details of the 1968 and 1973 Programs that we must now turn.

The 1968 and 1973 Incentive Programs were similar. Each included a Stock Option Plan and a Bonus Plan. Only the Stock Option Plans concern us here. Under each Stock Option Plan, the total number of shares as to which options could be granted during the five year life of the plan was 1.5 million. Of this total, an individual Board member could receive no more than 30,000 shares, and the options of Directors as a group were limited to 250,000 shares during the life of each Program.

In addition, each Program provided that (1) options could be granted only during the five year term of the Program; (2) options granted were not assignable except as specially provided in case of death; (3) either qualified or non-qualified stock options could be granted; (4) the option price was to be 100% of the fair market value of the stock at the time of the grant of the option; (5) all shares purchased pursuant to an option must be fully paid for at the time of exercise; and (6) after one year of continued employment with Exxon following the grant, options were exercisable as to one-half of the optioned shares only, and as to the remaining one-half, two years of such continuous service were required.

Finally, both the 1968 and 1973 Incentive Programs, as presented to the shareholders and as set forth in the proxy statements, contained provisions for amendments. Section XX of the 1968 Program stated in relevant part:

"The Board [of Directors] can from time to time amend this Program, or any provision thereof, except that:

(1) The maximum number of shares that may be effectively optioned to eligible employees, or to members of the Board either individually or as a group, cannot be increased;

(2) The classes of eligible employees cannot be changed;

(3) The minimum limitations with respect to the required continuity of employment following the grant of options, and the prices at which shares may be optioned, cannot be decreased;
* * *"

Section XX of the 1973 Program was identical, except that subsection (3) contained the following additional provision: ". . . and no option can be authorized that is exercisable more than ten years after the date of grant."

In two important respects, however, the 1968 and 1973 Incentive Programs were different. First, the 1968 Program had limited the number of shares which could be optioned in *each year* to an individual member of the Board to 10,000 shares, and limited grants to the Board of Directors as a group, to 75,000 shares in a year. These annual limitations were eliminated from the 1973 Program. Secondly, the 1973 Incentive Program expressly provided that an option granted under either plan may include a stock appreciation right, issued either at the time of grant of the option, or at a later date by an amendment to the option.

The stock appreciation right ("SAR") is described as follows in Section XII of the 1973 Proxy Statement (p. 50):

"A stock appreciation right shall entitle the optionee to surrender to the Corporation unexercised the option in which it is included, or any portion thereof, and to receive from the Corporation in exchange therefor that number of shares having an aggregate value equal to the excess of the value of one share over the purchase price per share specified in such option times the number of shares called for by the option, or portion thereof, which is so surrendered."

The corporation is entitled to elect to settle its obligation by the payment of cash equal to the aggregate value of the shares it would otherwise have to deliver. Section XII provides that a SAR is exercisable only to the extent that the option in which it is included is still exercisable. With a modification not relevant here, the closing price of

Exxon shares on the New York Stock Exchange on the trading day preceding the date of exercise of the SAR is used for purposes of valuation.

To understand these incentive programs, their effect and purpose, some general observations may be helpful. The larger, more profitable American corporations which have achieved their success against overwhelming international competition, have done so through the efforts of highly skilled, experienced managerial and executive personnel who generally have little or no ownership of the business and no share in the customary rewards of shareholders. Keeping the high level of motivation of these employees, retaining their loyalty in the future, and protecting their skills, experience and specialized knowledge from raids by competitors or others, is the biggest single responsibility of top management, which naturally is also interested in its own compensation. Vengeful, progressive income taxes directed against the managerial class have made it impractical to motivate and reward solely with large salary payments. Their net effect after taxes soon becomes marginal, costing the corporation more than it brings to the executive. Also, other incentives costing less may be more effective than mere salary, or may be tied in more directly with such matters as corporate earnings, and stock market performance.

Because the problems of management incentives, and the need to hold experienced employees, are so great, Exxon, like most organizations of its size, had a full time executive, whose title was "Senior Advisor Executive Compensation." Until his retirement on February 1, 1976, the witness James F. Moore held this position. Supervising a staff of eight or nine employees, Moore was responsible for programs leading to fixing salaries for approximately 3,000 senior executives of Exxon, and for developing and implementing, under direction of the Board of Directors, incentive programs involving stock options, bonuses, pensions, insurance, employee benefits, and whatever other means his ingenuity and research or

that of Exxon's competitors for managerial talent could evolve.

At all relevant times, Exxon had a "Committee on Executive Development and Compensation," called the COED Committee, which met every Monday afternoon to administer, among other things, incentives and compensation, bonus, stock options, and later, SARs, for employees other than directors. COED consisted of all directors who were officers and employees, with Moore attending without vote. In addition, there was a "Board Compensation Committee", referred to as the BCC, consisting of all the "outside" or non-employee directors, also assisted by Moore. The BCC dealt with the compensation of employees who were directors.

Moore's duties required him to be generally familiar with the income tax effect of various incentives, options and plans, on the employee, and upon Exxon. During the relevant period, there were substantial and changing differences in the tax treatment of qualified and non-qualified employee stock options, which need not concern us here. These tax and related effects varied according to the particular individual circumstances of the employee. In making grants of options, qualified or non-qualified, Exxon attempted to adapt the form of incentive to that most helpful to the individual employee.

Exxon's own image of its employee relations was not that of an innovator, nor the most lavish of employers. SARs, for example, were first granted by Xerox Corporation in its 1971 Plan. Moore's research led him in 1972 to suggest the same idea for Exxon's 1973 Program. Nor was Exxon the most lavish or generous of the large oil companies.

As used here, an SAR is only granted appurtenant to an existing or simultaneously granted stock option. Under applicable Internal Revenue provisions, attaching an SAR to an existing qualified stock option automatically converts that stock option into a non-qualified one, even if the SAR is not exercised. This may, or may not be desirable to a particular employee, depend-

ing ·on his own financial and income tax status. Obviously, since the typical stock option is a contract, an SAR may not be added unless both the employee and Exxon agree to it.

An operating example of use of an SAR may be helpful. Assume an employee has an unexpired option for 100 shares, which had been granted more than two years ago at an option price of $60.00 per share, and that an SAR had been granted at the time of issue, or thereafter by agreement. Assume further that the closing price of Exxon on the New York Stock Exchange yesterday was $75.00 per share, then the employee, by surrendering the option today and exercising the SAR, would be entitled to receive the excess of the value of the stock over the option price, multiplied by the number of shares opted. [*i. e.* $75. – $60 $\times$ 100 = $1,500.00]. The corporation can then elect to pay this sum either in cash or in stock, in which case the individual would receive a total of 20 shares free and clear with a market value of $75.00 per share. An employee· may at any time and from time to time exercise an SAR as to a portion only of the optioned shares; alternatively, he can exercise the option in whole or in part, and upon paying $60.00 per share receive shares worth $75.00 to the full extent of the option grant or in part. As will be discussed below, this usually entails the borrowing of money by the employee, with its attendant costs and risks. Grant of an SAR makes a non-qualified option more flexible to the worker, since he need not borrow or hold shares for which he has borrowed.

The 1973 Incentive Program provided specifically for the mechanism through which SARs would be granted. On p. 50 of the 1973 Proxy Statement it was stated: "Any option granted· under a shareholder approved stock option plan may include a stock appreciation right, either at the time of grant or by amendment." A shareholder approved stock option plan was defined to mean either the 1968 or the 1973 Incentive Program. Thus, as noted above, Exxon was given express authority to amend options which were outstanding under the 1968 Program so as to include SARs, upon consent of the affected employee.

The 1968 and 1973 Incentive Programs vested ultimate responsibility for their administration in the Board of Directors, which has, by resolution, delegated those duties to the COED and BCC committees, as noted above.

Under both the 1968 and 1973 Programs, only key employees are eligible for the grant of stock options. This comprises about 3,000 people in managerial and professional positions, but recent experience indicates that only about 900 individuals each year were actually awarded stock options. To govern the process of singling out deserving recipients among younger employees in the middle management and chemical engineering ranks, the COED Committee issued guidelines for the use of supervisors in making recommendations. These guidelines, which did not bind the Committee, stated in part:

"As opposed to bonuses which are primarily intended to recognize an employee's performance in the previous year, the purpose of stock options is to retain key employees by encouraging them to remain with the Company and to increase their shareholdings."

All of Exxon's sixty-one officers and directors are regarded as key employees; all of them received annual grants of stock options.

Under the 1968 Incentive Program, after a decision to award stock options had been made by the granting authority (COED or BCC), an employee with a base salary of $50,000. or more (raised in 1973 to $60,000.) was contacted by the· Executive Compensation Staff and was allowed to choose between accepting a qualified option, a non-qualified option, or between 1970 and 1972, a combination option. Employees with salary below $50,000. were awarded non-qualified options, except that between 1970 and 1972 they too were given the choice between non-qualified and combination options.

Qualified options, which were designed to fit Section 422 of the Internal Revenue Code, had a term of five years from the date of grant. Upon exercise, if the individual held the acquired stock for more than three years, any gain on the ultimate sale or exchange of that stock would qualify for long-term capital gains treatment. Non-qualified options had a ten year term from the date of grant. Upon exercise of the option, the individual realizes ordinary income measured by the difference between the option price and the fair market value of the stock. The corporation enjoys an income tax deduction for this same amount, but receives no deduction in connection with exercise by an employee of a qualified option. Neither the grant nor the exercise of a qualified or non-qualified option has any effect on the corporation's stated earnings or its profit and loss statement. The stock delivered to the employee comes from the capital account; in the case of a qualified option, that account is debited for the market value of the shares and then credited for the amount of the cash paid in by the employee, so that the net debit or decline in corporate net worth is the spread between the option price of the shares and their market value. For a non-qualified option, the same adjustment is made with respect to the capital account, except that the decline in net worth is less, because the tax deduction which the corporation receives upon exercise is also credited to the capital account.

In October 1970 the Board of Directors amended the 1968 Stock Option Plan. The purpose of this amendment, authorized by Section XX of the Program, was to take advantage of an IRS ruling which permitted the issuance of combination options. Such an option is a simultaneous grant of a qualified and a non-qualified option for the same underlying shares. While only one of the options could actually be exercised as to any particular optioned share, and once exercised, would reduce *pro tanto* the number of shares available under the other type of option, the combination option gives the individual greater flexibility in planning the tax and other financial consequences.

He can defer his choice between a qualified or non-qualified option from the date of grant to time of exercise. However, due to a change in tax rulings, no combination options were issued by Exxon after January 1973.

Of the 1,500,000 shares authorized under the 1968 Incentive Program, 1,485,090 shares (approximately 99%) had been awarded by the end of 1972, five months prior to the expiration date of the Plan. These options had been awarded in five separate grants: in 1968 at $83.25 per share, in 1969 at $61.13 per share, in 1970 at $71.50 per share, in 1971 at $72.44 per share, and in 1972 at $86.75 per share. Due to low market prices of Exxon stock, and high interest rates prevailing during this period, and perhaps to other factors as well, at the end of 1972, options covering 1,316,548 shares which had been granted under the 1968 Plan remained unexercised. It should be noted that while the 1968 Plan was to expire on May 31, 1973, the options granted under that Plan all had a minimum life of at least five years, which was measured from the date of the grant, and not from the date the Plan commenced. Although the 1968 Plan itself would expire in 1973, in that no more options could be granted pursuant to its terms after May 31, 1973, options already granted would of necessity continue in existence after that date and would lapse at varying times in the future, depending upon the original date of grant, and whether qualified (five year) or non-qualified (ten year) options.

*Count One: The 1973 Proxy Statement.*

The Proxy Statement (Ex. 14), which was mailed to the shareholders of Exxon on March 27, 1973, contained a resolution recommending the adoption of the 1973 Incentive Program to replace the about-to-expire 1968 Program. The proxy materials contained a summary of the essential features of the new Stock Option Plan at pp. 23–26, and the complete text of the 1973 Incentive Program at pp. 42–56. At the annual meeting held on May 17, 1973 in New York City, shareholder approval of the 1973 Program

was granted with more than 98% of the shares present voting in the affirmative.

Plaintiff contends that this vote of approval was a nullity, because management's Proxy Statement violated § 14(a) of the 1934 Act and Rule 14a–9 by omitting to state material facts with respect to SARs and the intention to amend certain options which were outstanding under the 1968 Plan.

We will consider plaintiff's numerous claims of material omissions generally in the form set forth in her proposed findings, submitted after the trial.

Plaintiff's first claim (Proposed Findings Nos. 76 and 78) is that the Proxy Statement was materially misleading by failing to disclose that the issuance of SARs under the 1973 Plan would require a charge against Exxon's earnings by an accrual of expense from the date of the grant of the SAR. The contention is that since under the 1968 Plan there was no charge to earnings arising at the grant of stock options, this difference should have been highlighted for shareholders who were being asked to approve a plan which for the first time gave authority for the issuance of SARs.

Applicable generally accepted accounting principles require that the estimated cost of SARs be accrued and charged against earnings, if the market price of the stock at the end of the first accounting period following the grant of an SAR is higher than the option price. The grant of a qualified, non-qualified or combination option under the 1968 Plan (which did not provide for SARs) had no effect on earnings. This is not to say that the grant, and the later exercise of stock options were without cost to Exxon and its shareholders, simply because no charge eventuated against earnings. Corporate net worth was diminished. When the corporation issued a share for the option price paid in cash, it lost the difference in value between the option price and the market price at the time of exercise. Even under generally accepted accounting principles, there is no free lunch, however the transaction may be booked.

The question is, did the failure or omission to describe the difference in accounting treatment constitute a violation of the proxy rules?

Rule 14a–9, 17 C.F.R. § 240.14a–9 states in relevant part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

A careful reading of the 1973 Proxy Statement and the entire 1973 Stock Option Plan quoted therein reveals that there is *no* discussion of the accounting treatment, or the entries made on Exxon's books, at the time of grant, either in the case of stock options or SARs. The summary outline of the Stock Option Plan does give a description of the different *tax* consequences, for Exxon and the employee, in connection with the grant and exercise of qualified options, non-qualified options and SARs. Should the Proxy Statement have also disclosed the different *accounting* treatment applicable to each of these means of executive incentive compensation?

I conclude that such disclosure was not necessary in order to make the statements which were made not false or misleading. Several reasons support this conclusion. First, the provisions in the Proxy Statement discussing the tax consequences stand by themselves and are truthful and complete. They need not be supplemented by any lengthy discussion of the proper accounting treatment for options and SARs. Secondly, the lack of any mention of proper accounting treatment in the Proxy Statement does

not imply that qualified and non-qualified options and SARs are all treated the same way on the company's books.

Shareholders will assume that the accounting and bookkeeping records of their corporation will be maintained correctly, and in compliance with generally accepted accounting principles, consistently applied. They are entitled so to assume, and are charged with the knowledge that transactions are going to be booked properly. I doubt it is material beyond that. The tax consequences for executives are material, because the tax results show the *net* rewards and incentives which the shareholders are asked to find reasonable, and authorize. The tax consequences to the corporation are of course material, because tax deductions make more money available to the business. The economic value of what was being given up was material, and was discernible in the proxy materials. Were a concise statement of the applicable bookkeeping possible, I believe it would not be material information for a reasonable shareholder in deciding whether to approve SARs. Particularly this is so in view of the small size of the necessary accrual, compared with the revenues of the corporation.

The test for materiality as enunciated in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) is whether there is ". . . a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2133.

Perhaps if accounting or bookkeeping had been mentioned at all, then, in order to avoid stating a half-truth, there would have been a duty to disclose that Exxon's earnings per books might be decreased by the grant of SARs and to describe the method which the accountants would use to calculate the charge against earnings, a charge which although accrued, might never be realized at all, or the amount of which would vary according to market price some four years later.

Important policy reasons relating to the natural limitations of any disclosure in the context of a proxy statement support our conclusion. Perhaps in a different world a detailed description of hundreds of pages setting forth all the accounting ramifications of options and stock appreciation rights would be desirable for whatever edification the average shareholder could derive. Whatever the relative merits of such a costly work, the law does not require it. Such in-depth treatment would take more than a few pages, and few but accountants, lawyers and financial analysts could comprehend it. It would be necessary to precede the discussion of the accounting treatment with a full explanation to the stockholders of such accounting terms as capital account, earned surplus, gross and net profit, net worth, cash flow, and others. The intricacies of income tax law and the accrual method of accounting must be understood, all merely as prerequisites to carrying the shareholder intelligently through contrasting the various entries that must be made on the books of the corporation when options and SARs are granted and exercised.[2]

---

**2.** Mr. Charles Jones was Exxon's Assistant General Counsel. Together with Mr. Moore he wrote the sections in the Proxy Statement dealing with the 1973 Incentive Program. At one point in the drafting process, Mr. Jones considered the possibility of including the following sentence with regard to the comparative cost to the corporation of stock appreciation rights and options:

"Whether such obligation [arising out of the exercise of an SAR] is settled in shares or cash, the effective cost to the Corporation will not exceed the cost it would have in-

curred upon exercise of the surrendered option."

Jones testified at p. 566, that originally he put this sentence in because its subject was cost (i. e. effect on net worth) and that was an important factor for the shareholder to consider. However, once he saw the sentence down on paper, he realized that it was too simplistic to describe this complicated subject adequately, and concluded that an extended explanation would be necessary to cover the topic properly. He decided that while such a lengthy disclosure might prove to be an interesting lesson in

■ Courts have shown themselves reluctant to require those soliciting proxies to swamp shareholders with masses of raw data. *See, e. g., Denison Mines Ltd. v. Fibreboard Corp.*, 388 F.Supp. 812 (D.Del. 1974). Nor in the absence of some glaring misrepresentation, omission or fraud should a court substitute for that of the authors, its own views as to what omitted topics should have been discussed. We note in passing that twenty-two out of the fifty-six pages of the 1973 Proxy Statement were devoted to a discussion of the 1973 Incentive Program.

Finally, the SEC's long standing policy against valuation predictions in proxy statements, found in Note (a) to Rule 14a–9, tended to inhibit any extensive discussion about accounting since ultimately Exxon would not have been allowed to predict, directly or indirectly, for its shareholders how much of a charge against earnings would actually have to be made. *Cf. Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281 (2d Cir. 1973).

■ The requisite accrual against earnings was an important fact which distinguished SARs from options. If the Proxy Statement had in some way implied or represented that SARs were in all respects just like options, then a duty might have arisen to explain the accounting differences. It is primarily because the omission to reveal the need for the accrual did not make any of the other statements in the Proxy materials false or misleading that the Court must reject plaintiff's first claimed violation, and finds the failure to discuss the accounting aspect of SARs was not a violation of Rule 14a–9.

Rulings of the Accounting Principles Board, such as APB 25 (Ex. 366), pertinent here, are general in their application and are directed usually to the correction of perceived evils which may not be so general. Accordingly, many of the rules for accrued charges against earnings are somewhat technical and may be unrealistic in a given situation. So it is with the charge to be made against income at the end of the fiscal period in which the SAR is granted. When the bookkeeping entry is made, it is not known whether the SAR will be exercised, and the option to which it is attached will lapse, or vice versa, or whether both will lapse, due to cessation of employment or because market price is below option price at expiration. And there is no logical relationship between the market price of the stock when the accrual is made, or adjusted annually, and the unforeseeable market price on the date of exercise. Why then, should such an unsound entry be required?

In well remembered times, stocks yielded a greater payout (dividend) than bonds, and the expected dividend rate, and its relative certainty were the principal factors determining the market price of a stock. Because of the income tax, and because dividends had to be paid in cash, there was little temptation to overstate corporate income. Indeed, the struggle was directed towards understating, saving income tax, and conserving cash.

Secular changes, mostly associated with consistently increasing inflation, and frequent acquisition of going concerns and property in exchange for stock, changed managerial motivation. It became tempting to overstate income by failing to accrue foreseeable expenses. Stocks yielded less payout than fixed income securities, and tended to sell with reference to their earnings per books and their future expectation of earnings, referred to as the "price earnings multiple," without regard to dividends paid. The higher the book earnings, and the higher the multiple, the more valuable the shares, and the cheaper and easier the acquisition of property or businesses for stock. While all this was taking place, yesterday's high dividend payers found that the inflated replacement cost of physical property made their depreciation reserves

accounting principles, it would not be worth the extended space which it would take up in the Proxy Statement. Therefore he completely

deleted any reference to cost from the discussion of SARs. His decision was neither negligent nor unreasonable.

inadequate, they suffered capital attrition and fell from investor favor.

Accountants, observing the changes mentioned, became concerned over "creative" bookkeeping which tended to overstate income. It became essential to establish accruals and reserves for every known contingency or foreseeable event which, if omitted, might result in overstated income. Such fears of possible abuse led to APB 25, requiring the accrual. Regardless of whether it represents an overreaction, the net effect of it, as noted herein, is insignificant in the case of Exxon.[3]

■ Plaintiff next asserts (Proposed Findings Nos. 79 and 81) that the Proxy Statement was materially misleading in failing to disclose that of the 1,485,090 options granted under the 1968 Program, only 178, 542, or 12%, had been exercised and that options covering 1,316,548 shares remained unexercised as of December 31, 1972. As part of this contention, plaintiff claims that the shareholders should have been told that if SARs were added by amendment to all of these outstanding options, and if the price of Exxon stock then rose to $110. per share, then there would be a potential charge against earnings of $39,000,000.00.

I refuse to find that this was a misleading omission. The Proxy materials did reveal that of the 1.5 million shares authorized by the 1968 Plan, 1,485,090 shares had been optioned as of March 1, 1973. Also a schedule (pp. 23–24) showed the number of shares which had been optioned each year

under the 1968 Plan, and the option prices. The market value of the Exxon stock on March 1, 1973 ($89.94) was disclosed on p. 24. In addition, the data on p. 17 showed that Exxon's sixty-one officers and directors held unexercised options covering 336,100 shares as of March 1, 1973 at an average option price of $74.91 per share.

This disclosure was adequate to inform the shareholders that by making these grants under the 1968 Program, Exxon had incurred an obligation to deliver a substantial number of shares upon the exercise of these options at some future point in time. As of the date of the Proxy Statement, all of the options issued since 1968 had value, in that each option price was lower than the market price on that date. Also, any shareholder who made a reasonable effort to read the Proxy materials would realize that as of that date all of the 1972 options and half of the 1971 options had not yet become exercisable, because of the continuity of service requirements which were an essential feature of the 1968 Plan.

Thus it was clear that as of March 27, 1973, there were a substantial number of unexercised but very valuable options outstanding. If the shareholder wanted to know the precise number of unexercised options which were outstanding under the 1968 Plan, and the average exercise price, he could have looked at p. 33 of the previously issued 1972 Annual Report.[4]

Any disclosure of a potential charge in the amount of $39,000,000. against earnings would have been improper as a prediction

---

**3.** Mr. Newman T. Halvorson, a member of the Accounting Principles Board dissented from APB 25, and stated that he believed "the Board is acting prematurely on a subject that presumably is being explored more comprehensively in an accounting research study now in progress and that the alleged abuses in accounting for stock compensation which the Opinion seeks to correct have been emphasized out of proportion to their real significance because of the abiding human concern and curiosity about executive compensation, which is a very different thing from the usually relatively immaterial accounting effect of the alleged abuses on results of operations and financial position." Mr. Oscar Gellein dissented in part because he be-

lieved it "inappropriate . . . to measure the compensation on the basis of changes in market value after the awards are made."

Several members assented with qualifications and expressed reservations. In short, APB 25 cannot be regarded as graven in stone.

**4.** See Rule 14a–3(b), 17 C.F.R. § 240.14a–3(b), which provides that any proxy solicited by management in connection with an annual meeting at which directors will be elected must be preceded or accompanied by an annual report. The SEC has rejected a proposal that all proxy statements duplicate the financial date furnished to shareholders in the corporation's annual report. 2 L. Loss, *Securities Regulation*, 886–87 (2d Ed. 1961).

of future market value, since it was based on the assumption that Exxon stock would reach $110. per share.[5] See Note (a) to Rule 14a–9. The shareholders were of course told that SARs could be added by amendment to options outstanding under the 1968 Plan. At the date of the annual meeting, Exxon management had no knowledge as to precisely how many SARs would be issued on these outstanding options. The 1973 Incentive Program merely gave authority to grant SARs. It did not *require* that they be granted. And, even if the decision to grant SARs on all outstanding options were made, no SAR could actually be awarded to the option holder, until he had given his written consent. Some would refuse, since their qualified options would become nonqualified.

It is clear that as of May 17, 1973, Exxon had no reliable way to predict the cost of granting SARs, and any attempt to speculate or estimate the cost would have been improper and probably unlawful if contained in the Proxy Statement.

With respect to plaintiff's related claim that the Proxy Statement should have disclosed that from the standpoint of net after-tax earnings, it was more beneficial to the corporation if the employee exercised a stock option as opposed to an SAR (Proposed Finding No. 83), the Court has already concluded that it was not materially misleading to omit any discussion of the accounting treatment of stock options and stock appreciation rights. Furthermore, since it was expected that SARs would have only a very slight impact on Exxon's earnings, this was not material.[6]

Exxon shareholders were being asked to vote on a plan which had been drawn up and presented by management. The issue which they had to decide is whether that plan was in the best interests of the corporation. That it would cost money was readily apparent to a reasonable shareholder from the information furnished. If the disclosure sought by plaintiff had been made, it would have been misleading. The Proxy Statement could not make the conclusory statement that it was better for the earnings of the corporation if executives exercised options rather than SARs, without also disclosing that the delivery of shares upon the exercise of an option decreases the corporation's net worth by the amount of the difference between (1) the cash paid for the shares (option price), and the tax credit, in the case of a non-qualified option; and (2) the fair market value of the shares at the time of delivery.

For the same reasons the Court rejects plaintiff's contention (Proposed Finding No. 85) that omitting discussion of cash flow made the Proxy Statement false or misleading.

Plaintiff next asserts (Proposed Finding No. 87) that SARs are valuable securities in and of themselves, and had substantial economic value to Exxon's officers and directors; facts which should have been disclosed in the Proxy Statement.

Whether SARs are securities in and of themselves when appurtenant to an option which except on death is not assignable presents a question of law which had not been definitely settled by the SEC at the time the Proxy Statement was sent out

5. In arriving at his $39,000,000. figure, Mr. Moore also assumed that all SARs would be exercised when Exxon's stock reached $110. per share. Moore, however, recognized that the decision to exercise depends in part on an individual's own perception of the likely future movement of the stock, and that this perception is likely to differ even among Exxon executives. For Moore, who was trying to calculate an outside maximum potential charge against earnings, the $39,000,000. figure even with all the questionable assumptions, was a useful, initial tool with which he was able to work in attempting to decrease Exxon's costs. For the average shareholder, who was not concerned with the same issues as the Senior Advisor of Executive Compensation, his $39,000,000. working estimate had little utility, and was much more likely to be confusing than helpful.

6. In actuality, the impact was in the order of magnitude of three tenths of one percent (.003). While subject to change depending on many unknown factors, this amount is hardly material to a reasonable shareholder in that he would consider it important in deciding to vote for or against the Plan.

and may still be in doubt. In light of this uncertainty, it would have served no useful purpose for Exxon to have attempted to characterize an SAR either as a separate security, or as a right which is merely appurtenant to and inseparable from a non-transferable stock option. Failure to disclose a legal theory with which those soliciting do not agree and which was not called to their attention at the proper time does not violate Rule 14a–9. See *Ash v. LFE Corp.*, 525 F.2d 215 (3d Cir. 1975). Mr. Moore and Mr. Jones, the men who drafted the Proxy materials, apparently believed at that time that SARs were not equity securities as defined by § 3(a)(11) of the 1934 Act. Since they then disagreed (and probably still do) with plaintiff's conclusion that an SAR was a valuable security in and of itself, they were under no duty to discuss the speculative theory propounded by plaintiff.

■ Plaintiff contends in Proposed Finding No. 89 that the Proxy Statement omitted to disclose that SARs would discourage employee-directors from exercising stock options, since upon the exercise of an SAR, the stock option to which it is appurtenant is surrendered back to the Corporation, and the employee acquires a lesser number of shares without borrowing or using any personal funds. On p. 25 of the Proxy Statement, the following passage described the SAR:

"This right permits an optionee to surrender an unexercised option with respect to any number of unpurchased shares and to receive from the Corporation in exchange a lesser number of shares having an aggregate value equal to the difference between the option price of such unpurchased shares and the market value of such unpurchased shares on the date the option is surrendered."

This passage makes clear precisely what rights were given to the optionee by the grant of an SAR. It was not materially misleading for the Proxy materials to have omitted discussion of the likely preferences of employees following granting SARs. Indeed to have included at the time the Proxy materials were sent out the conclusory statement that SARs discourage recipients from exercising options would have itself been misleading and perhaps untrue. It would have been a speculative assertion, unsupported by any empirical evidence, and an overgeneralization since the decision whether to exercise the option or the appurtenant SAR necessarily depends on individual factors such as the employee's own financial situation, his ability and willingness to borrow, and his tax consequences.

■ Next, in Proposed Finding No. 91, plaintiff claims that the evidence shows that at the time the Proxy Statement was mailed, the Board of Directors intended to amend all outstanding stock options and add SARs as soon as the shareholders approved the 1973 Incentive Program. According to plaintiff, this intention should have been disclosed. The Court declines to so find. The only evidence on intention is that Mr. Moore and his staff were preparing studies and analyzing the costs to the corporation of offering SARs to all executives earning $75,000.00 or more, who held unexercised stock options. The evidence does support a finding that prior to the shareholder's meeting Moore and his staff planned to recommend to the BCC and the COED Committees that such an offer to these executives should be made. It would have served no useful purpose to require a corporation to disclose staff recommendations which in fact were ultimately rejected by the entire Board.

■ Plaintiff further contends in Proposed Finding No. 93 that the Proxy Statement should have disclosed that there was no additional one or two year service requirement with respect to SARs which might be granted on unexercised pre-existing options already outstanding under the 1968 Plan. The 1973 Plan, in authorizing the grant of SARs on these options, imposed no new continuity of service requirement upon the holders of these options. In other words, upon the grant of an SAR on an outstanding option, the recipient could exercise the SAR (or the option) immediately as to all of the optioned shares, so long as

he had remained an employee of Exxon for more than two years following the original grant of the option. If it had only been one year since the grant of the option, he could immediately exercise the SAR (or the option) as to only one-half of the shares. Indeed, notwithstanding the tax and accounting differences, it is clear that it made no difference to Exxon management whether a key man selected a qualified or non-qualified option in the first instance, or whether he later converted a qualified option to become non-qualified, by adding an SAR, and also made no practical difference whether he exercised the SAR or the option. The corporate motive was to adapt the benefit to the needs and desires of the key man, so as to exert maximum incentive effect. The tax and accounting differences resulting to the company from the choice made by the worker were trivial and of no moment. This management philosophy is not to be regarded as unreasonable, or contrary to the shareholders' interests, and comes through from a mere reading of the Proxy Statement. There is no misrepresentation, and the omission is not material.

On p. 24 of the Proxy Statement the shareholder was informed that under both the 1968 and 1973 Plans, *options* were exercisable only if the employee satisfied the continuity of service requirements referred to above. Nothing was said anywhere as to any service requirement with respect to the grant and exercise of stock appreciation rights on pre-existing options.

While the corporation lacked authority to decrease the continuity of employment term in options (Sec. (3) of the 1968 Plan), nothing in either Plan required it to impose an additional period of service when it issued SARs on old options. A reasonable shareholder would have understood this fact.

■ In Proposed Finding No. 95, plaintiff asserts that the Proxy Statement should have disclosed that the Board of Directors intended to extend the life of all qualified options granted in 1968 and 1969 from five to ten years, thereby making them non-qualified. This argument relies on hindsight, reasoning that because these options were later extended, there must have been an intention to do it all along. But there is no competent evidence that the granting committees had made such plans or decision. True, Moore and his staff were considering the possibility of offering extensions to optionees. But the ultimate decision rested with the BCC and the COED, which were not bound by staff recommendations. Since neither of these committees had considered the extension question prior to the shareholders' meeting, there was no need to disclose the possibility in the Proxy materials.

Next plaintiff claims (Proposed Finding No. 97), that it was materially misleading for the Proxy Statement to fail to disclose that extending an outstanding option is economically tantamount to the granting of a new option, and that such an extension confers a substantial benefit on the recipient. Assuming this to be true, there is no requirement that such theory be disclosed in the Proxy materials.

■ Congress enacted § 14(a) of the 1934 Act to insure that full and fair disclosure would be made to stockholders whose proxies are being solicited so that they can make an informed and meaningful choice among alternative courses of action. *J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). The legislative purpose must be kept in mind in considering claimed violations of Rule 14a–9.

■ Exxon's shareholders were faced with the choice of adopting or rejecting the 1973 Incentive Program. The Proxy Statement set forth the entire text of the Program, and it also gave a short summary of its main provisions. It was clearly disclosed that under the 1973 Stock Option Plan, the granting authority was to have the power to amend an outstanding option upon the consent of the grantee, so as to incorporate into that option any terms (such as a ten-year life span for the option from the date of the grant) which might have been includ-

ed in the original grant. The federal interest in protecting the right to fair corporate suffrage was satisfied since there was full and fair disclosure of the terms and provisions of the 1973 Incentive Program.

 Finally, in Proposed Finding No. 99, the plaintiff asserts that the Proxy Statement should have disclosed that a primary purpose of stock appreciation rights was to assist officers and directors who were struggling with Section 16(b) problems. This was not defendants' purpose.[7] Although Moore and Jones were aware of certain theoretical arguments as to possible Section 16(b) consequences, they disagreed vehemently with those theories, and in fact did not even believe that SARs were equity securities under the then existing definition in Section 3(a)(11). As stated before, there is no requirement to discuss within the confines of a Proxy Statement, legal arguments and theories with which those soliciting disagree. See *Ash v. LFE Corp., supra.*

The Court also rejects plaintiff's conclusory allegations in Proposed Findings Nos. 101 and 102. Since plaintiff has not proven any of the claimed violations of Rule 14a–9, defendants are entitled to a judgment that all relief be denied on the First Count of the Amended Complaint.

7. Defendants' purpose was to obtain for Exxon's key employees during the next five years an Incentive Program to replace the expiring 1968 Program, having all of the up-to-date devices adding flexibility enjoyed by Xerox Corporation, the Mobil Oil Company and others with whom Exxon must compete for such employees. As soon as SARs proved successful at Xerox it was to be expected they would spread to others.

8. The letter from the SEC staff to Xerox was dated April 6, 1973. According to 17 C.F.R. § 200.81, this letter became publicly available 30 days thereafter. However, the earliest public reference thereto was in a legal periodical dated May 16, 1973. There has been no showing that anyone at Exxon knew about the Xerox letter prior to the shareholders' meeting which was held on May 17, 1973.

9. The SEC had announced the amendment to Rule 3a(11)–1, 17 C.F.R. § 240.3a(11)–1, in its Exchange Act Release No. 10129, dated April 29, 1973. This amendment was scheduled to become effective on June 15, 1973, and pro-

*Count Two: Additional Factual Background of the § 16(b) Claims.*

On May 23, 1973, less than one week after the shareholders' meeting which approved the 1973 Incentive Program, Exxon's officials learned for the first time that the grant of an SAR to an officer or director might raise problems under § 16(b). Following the COED Committee meeting on that day, Mr. Jones heard about an Interpretive Letter sent by the Staff of the Division of Corporate Finance of the SEC to Xerox Corporation.[8]

The Xerox letter expressed the view that the acquisition of a stock appreciation right was a purchase of an equity security within the meaning and intent of § 16(b). At about the same time, Exxon's Legal Department became aware of SEC Exchange Act Release No. 10129, which expanded the definition of equity security in Rule 3A(11)–1, 17 C.F.R. § 240.3a(11)–1 so that it now became broad enough to include stock appreciation rights.[9]

These developments set off a flurry of activity in Exxon's legal department, generating in their wake legal memoranda, position papers, proposals and counter-proposals, all of which are of marginal relevance to this lawsuit.

posed to expand the definition of equity security in Section 16 of the 1934 Act to include "any put, call, straddle, or other option or privilege of buying such security from or selling such security to another without being bound to do so." The reason for the amendment had nothing to do with SARs. The real purpose was to extend federal jurisdiction over transactions on the Chicago Board of Options Exchange, which was about to commence operations in trading transferable options to buy listed stocks. The existing definition of equity security did not include such options. As Mr. Jones quickly realized, this expansion of the meaning of equity security was at least arguably broad enough to bring SARs within the ambit of Section 16(b), although SARs were not its target.

This Release was first published May 8, 1973. It had probably reached the Exxon Law Department by May 17, 1973, but the evidence shows, and I find, that Jones did not learn of the amendment to Rule 3a(11) until shortly after the Exxon shareholders' meeting.

By the middle of summer, the officials responsible for administering the 1973 Incentive Program had decided on a plan of action. Exxon would refrain from issuing any SARs until the § 16(b) problems were resolved, although the majority of the potential recipients of SARs were not officers or directors and therefore were not affected by § 16(b). Meanwhile Exxon's law department would join forces with that of Mobil Oil and others to use their best efforts to persuade the SEC staff to review and reconsider the interpretive advice given Xerox.

These efforts bore fruit on February 7, 1974, when the SEC's Division of Corporate Finance officially withdrew its Letter to Xerox, and advised Mobil in a separate letter that the *grant* of an SAR was not a purchase, and accordingly exempt from the operation of § 16(b). Mobil was informed that the acquisition of stock upon the exercise of an SAR *would* be deemed to involve "a purchase" within the meaning of that term in § 16(b). In issuing this advice the SEC assumed but did not specifically decide that SARs were equity securities within the meaning of newly revised Rule 3a(11)–1.

Responsible officials at Exxon concluded that this Mobil letter, combined with the withdrawal of the Xerox ruling, cleared the way for the issuance of SARs to eligible employees. During the period from March to May 1974, 968 employees holding exercisable options granted under the 1968 Program were given the opportunity to have their options amended to include SARs. In November 1974, 613 employees holding exercisable options issued since 1968 were similarly asked. Of the first group, 416 employees and 209 in the second group requested that SARs be attached to their options. All of these requests were honored by Exxon.[10] As noted above, most of the employees to whom Exxon has issued SARs are neither officers nor directors, and their transactions are thus not subject to § 16(b).

From mid-April 1975 through June 1, 1976, a number of the individual defendants exercised their SARs for an aggregate of 71,150 optioned shares. In settlement of these SARs exercised by officers and directors, Exxon issued 15,917 shares[11] having an aggregate value, based on the closing stock price on the day prior to exercise of $1,478,617.00, plus cash in lieu of fractional shares totaling $937.00.[12]

Plaintiff's theory here is that the issuance of these shares upon the exercise of SARs was a simultaneous purchase and sale of an equity security. Plaintiff seeks to recover for the benefit of the corporation the alleged short-swing profits earned thereon by officers and directors. Recovery by the Corporation of these alleged profits (as measured by the value of the shares awarded in settlement of the SARs) would of course substantially destroy the utility of the SAR as an incentive compensation device for officers and directors, since they would be required to return all benefits or profits resulting from their ownership of the SARs, and accrued since six months. See Rule 16b–6.

It is to an analysis of § 16(b) and the cases interpreting that section that we must now turn. Section 16(b) of the 1934 Act imposes a strict prophylactic rule with re-

---

**10.** In November 1975, as part of the annual grant of stock options, 936 employees received options for 275,100 shares containing SARs. These options and the corresponding SARs had not yet become exercisable at time of trial, due to the continuity of service requirements which are incorporated into all Exxon stock Option grants.

**11.** Exxon also issued 806 shares to Siro Vazquez upon his exercise of SARs pertaining to 9,000 optioned shares. However, at the time of this exercise, Mr. Vazquez had resigned as an officer and a director of Exxon and was therefore no longer subject to the insider trading provisions of Section 16(b).

**12.** All SARs granted to officers and directors specifically provided that settlement would be made in stock only. However, in lieu of issuing fractional shares upon the exercise of an SAR, Exxon has settled a portion of its obligations in cash. Plaintiff concedes that these cash payments are de minimis and does not challenge their propriety under Section 16(b). It might be noted in passing that Exxon has settled some of the SARs granted to employees who were neither officers nor directors in cash.

spect to insider short-swing trading *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). Section 16(b) states in relevant part:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . . This subsection shall not be construed to cover . . . transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

It is well settled that by enacting § 16(b), Congress recognized that short-swing speculation by large stockholders, officers and directors, all of whom might have access to inside information, would threaten the goal of the 1934 Act "to insure the maintenance of fair and honest markets." *Kern County Land Co. v. Occidental Corporation*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). In order to achieve its goal, Congress chose a relatively arbitrary rule capable of easy administration. Thus, the objective standard of § 16(b) imposes strict liability upon substantially all purchases and sales occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. *Bershad v. McDonough*, 428 F.2d

693, 696 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

While uncomplicated purchases and sales within six months are clearly prohibited by the statute, ". . . courts have wrestled with the question of inclusion or exclusion of certain 'unorthodox' transactions, . . ." including dealings in options. *Kern County Land, supra*, 411 U.S. at 593, 93 S.Ct. at 1744; *Blau v. Lamb*, 363 F.2d 507, 516 (2d Cir. 1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

In considering these out of the ordinary situations, courts have applied the statute when such application would serve its goals. As the Supreme Court stated in *Kern County Land, supra*, 411 U.S. at 594–95, 93 S.Ct. at 1744–45:

"In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information—thereby endeavoring to implement congressional objectives without extending the reach beyond its intended limits."

The statutory definitions of purchases and sales are broad.[13] However, when the purpose of the statute would not be served by its application in a particular situation, courts have characterized borderline transactions as outside its scope. The Supreme Court has recognized and approved this approach in *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, n. 4, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1973), where it stated:

"In interpreting the terms 'purchase' and 'sale', courts have properly asked whether the particular type of transaction is one that gives rise to speculative abuse."

See, also *Schur v. Salzman*, 365 F.Supp. 725, 729, n. 10 (S.D.N.Y.1973).

Thus the question whether upon the exercise of a stock appreciation right, the unex-

---

**13.** The term "purchase" is defined in § 3(a)(13) of the 1934 Act, 15 U.S.C. § 78c(a)(13) to include ". . . any contract to buy, purchase, or otherwise acquire." The term "sale" is defined in § 3(a)(14) of the 1934 Act, 15 U.S.C. § 78c(a)(14) to include "any contract to sell or otherwise dispose of."

ercised option is *sold* back to the corporation (as plaintiff claims) within § 16(b), or whether that option is merely *cancelled* and *surrendered* (as defendants claim) cannot be decided apart from the issue whether the exercise of an SAR gives rise to a substantial risk that short-swing profits will be obtained based upon access to inside information. This requires a detailed examination of the SAR from an economic perspective. It is to that analysis that we must now turn.

*The Stock Appreciation Right.*

In analyzing the applicability of § 16(b) to SARs, consideration must first be given to the application of the statute to the underlying stock option to which the SAR is always attached. Pursuant to the authority granted to it in the last sentence of § 16(b), the SEC has exempted certain transactions in stock options by promulgating Rule 16b–3, 17 C.F.R. § 240.16b–3, which states in relevant part:

"Any acquisition of shares of stock (other than stock acquired upon the exercise of an option, warrant or right) pursuant to a stock bonus, profit sharing, retirement incentive, thrift, savings or similar plan, or any acquisition of a qualified or a restricted stock option pursuant to a qualified or a restricted stock option plan, or of a stock option pursuant to an employee stock purchase plan, by a director or officer of the issuer of such stock or stock option shall be exempt from the operation of Section 16(b) of the Act if the plan meets the following conditions: "

We omit the relevant conditions, all of which are satisfied by Exxon's stock options.

In short, Rule 16b–3 exempts the *grant* of a stock option, such as Exxon's, from being regarded as a *purchase* under § 16(b). However, the shares acquired upon the *exercise* of an option are not exempt under the Rule. Such exercise is treated as a *purchase* on the date of exercise, for purposes of computing the six-month period. *Keller Industries Inc. v. Walden*, 462

F.2d 388 (5th Cir. 1972). Thus any sale by an officer or director within a six-month period, either before or after the date of exercise of a stock option may result in a short-swing profit recoverable by the Corporation under § 16(b).

Even if such a sale is made, Rule 16b–6 limits the amount of profit actually recoverable by the company with respect to option stock acquired under options granted more than six months before to the difference between the proceeds of the sale and the lowest market price of the same security within six months (either before or after) the date of sale. Thus any long term appreciation between the option price and the six-month low is protected from the Draconian results of § 16(b).

In promulgating these rules, the SEC has recognized two self evident truths: (1) stock options are an important, widely used and legitimate incentive compensation device; and (2) the danger of speculative abuse is greatest at the moment when the individual makes his decision to exercise his options. It would be reasonable to expect that one who has adverse inside information might be inclined to exercise his option before the market price declines or "goes under water", i. e., sinks below the exercise or option price, and then immediately dispose of the stock in a sale. Rule 16b–3 takes all the short-swing profit out of any such action, while preserving the long-term profit, if any. The risk of speculative abuse sought to be prevented by § 16(b) is not found in the individual's ability to determine the proper moment to exercise his option. Rather, it lies only in the deliberate timing of this decision within six months of the individual's decision to sell stock. To deal with this perceived evil, any sale within six months is automatically paired with the purchase of the stock which is deemed to have been made upon the exercise date of the option.

Of course, subject to the effect, if any, of Rule 10b–5, an "insider" may speculate and realize profits over a period longer than six months. Apart from any § 16(b) consequences, the investment decision of an exec-

utive holding a stock option will necessarily be the product of at least three factors: (1) his own perception of the future trend of stock market prices in general, and his own company's stock in particular; (2) the income tax consequences flowing from an exercise at a particular point in time; and (3) his own financial situation. With regard to this third factor, his willingness and ability to borrow funds and to pay interest thereon, in order to be able to pay 100% of the option price to the company at the time of exercise is of particular importance. The higher the interest rate, the more expensive it will be to borrow, and this problem was especially acute in 1973 and 1974 with a double-digit prime rate.

Of course, by exercising options for Exxon stock, having a relatively steady dividend, the yield could be used towards the interest on the loan. However, during the period of the double-digit prime rate, this dividend income was not sufficient to offset the interest burden. The excess of interest over dividend after the related income tax deduction therefor, was a burden on the executive. In effect, his spendable income was *reduced* by the exercise of an option. Hardly the purpose of the Plan, and not much of an incentive! Add to this the generally understood factors that: (a) most executives lack savings or inherited wealth with which to exercise options; (b) some cannot borrow, although Exxon employees, according to Moore, experienced no difficulty; (c) there is a strong compulsion to exercise options which have value, before they expire. Any failure to do so would show lack of faith in the company's future, and lack of appreciation for the grant. Any executive who let an option having value lapse unexercised would be unlikely to be granted any more options.

The evidence supports the inference that the responsible officials at Exxon saw the SAR principally as a device which would relieve employees from the need to borrow, hold, and pay interest in order to exercise their options, when it was uneconomic, at least on the short term, to do so. This purpose, rather than any evasion of § 16(b) by exercise of SARs by officers or directors was the reasonable and actual motivation for adopting the device.

■ Purpose, however, is not the test as to whether § 16(b) has been violated. Exxon granted no SARs until after the staff of the Division of Corporate Finance of the SEC had withdrawn the Xerox ruling and had issued the (favorable) February 7, 1974 Interpretive Letter to Mobil. However, the parties concede neither of these interpretive rulings are binding here. The same is true for the Interpretive Letter issued to Exxon on March 1, 1976 after the commencement of this action, expressing basically the same position on SARs that had first been stated in the Mobil letter two years earlier. *See, CCH Fed.Sec.L.Rptr.*, 1975–76 Transfer Binder ¶ 80,472. Of perhaps greater importance in so far as concerns the *future* treatment of stock appreciation rights is the recent promulgation of proposed amendments to Rules 16b–3 and 16a–6(c). See *Exchange Act Release No. 12374, CCH Fed. Sec.L.Rptr.*, 1975–76 Transfer Binder ¶ 80,-462 (April 23, 1976).

At present neither Rule mentions SARs, and undoubtedly the time has come for the SEC to codify the numerous no-action letters and interpretive rulings of the past several years. The overall purpose of the proposed amendments is to bring the § 16(b) treatment of SARs into line with the existing provisions governing stock options. Thus the *acquisition or grant* of SARs would not be a reportable transaction under § 16(a) and would thus be exempt from § 16(b).

The proposed amendments also would clarify the principal issue in this action, by providing that the expiration and/or surrender of an option upon the exercise of the appurtenant SARs is not a *sale back* to the company, either of the option, or of the underlying stock, but does involve an acquisition or *purchase* of those shares received upon the exercise of the SAR. The acquisition of these shares only, would become a reportable transaction or "purchase" under § 16(a) and subject to the insider trading provisions

of § 16(b). The proposed amendments are logical and pragmatic. They make sense.

In accordance with the same pragmatic approach adopted by the Supreme Court in *Kern County Land Co. v. Occidental Corporation*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973) and *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1973), the Court will resolve the § 16(b) claim here by examining first the nature of the transaction which occurs when an SAR is exercised and then the risk of speculative abuse inherent in that transaction.

Plaintiff has asserted two possible theories to require that exercise of an SAR, with concurrent surrender *pro tanto* of the option to which it was attached be regarded as effecting a simultaneous purchase and sale within § 16(b). First, plaintiff argues that the exercise of an SAR, while appearing to be a single transaction is in reality two matched transactions, a *purchase* of *stock* equal to the aggregate amount of the spread and a simultaneous *sale* of the *stock option* back to the corporation.[14]

The gist of plaintiff's characterization is the assumption that the surrender and cancellation of the stock option upon the exercise of the attached SAR involves a *sale* of that option back to the corporation as a matter of law. However, the cancellation and surrender of the option under these circumstances is more analogous to an expiration or lapse than it is to a sale. Upon the exercise of a related stock appreciation right, the stock option and all rights appurtenant to it are completely extinguished just as if the option had lapsed or expired; if in fact the option were being sold or transferred back to Exxon, then one would expect the transferee to have the same right in the option (*i. e.*, the right to buy a certain number of shares at a fixed price before a certain date) as the transferor, or in Exxon's case, the right to reissue the option to some other employee. It cannot.

The analogy to a lapse or expiration is not a perfect one, since here the giving up of the option is fully compensated for by the exercise of the SARs, and no loss is suffered by the holder whether he exercise the SAR, or the option.

Of course that is all he ever had—the right to choose which of the two joined rights he would exercise, the option right, or the stock appreciation right. On this, the Incentive Plan is clear. It reads in relevant part (May 17, 1973 Notice of Annual Meeting and Proxy Statement, p. 50):

"XII. Stock Appreciation Rights. Any option granted under a shareholder approved stock option plan may include a stock appreciation right, either at the time of grant or by amendment. Such stock appreciation right shall be subject to such terms and conditions not inconsistent with the relevant Plan, as the granting authority shall impose, including the following:

(1) A stock appreciation right shall be exercisable to the extent, and only to the extent, the option is exercisable.

(2) A stock appreciation right shall entitle the optionee to surrender to the Corporation unexercised the option in which it is included, or any portion thereof, and to receive from the Corporation in exchange therefor that number of shares having an aggregate value equal to the excess of the value of one share over the purchase price per share specified in such option times the number of shares called for by the option, or portion thereof, which is so surrendered."

Neither the precise words of the Plan, nor the economic effect of the transaction require us to distort an election between two methods of previously granted executive incentive compensation, and a surrender or lapse of the alternative not so chosen, into a purchase or sale not made. In any event it is clear that the optionee has

14. The fact that the theoretical purchase transaction involves *stock*, while the claimed sale involves a *stock option*, would not be fatal to plaintiff's claim under Section 16(b) since both

the stock and the option are now included in the broad definition of equity security contained in Rule 3a(11)–1.

not *sold* the surrendered option to the corporation; nor has Exxon in any real or fancied sense bought it. It has merely become forever extinguished, because of an election by the owner to enjoy the SAR instead. Plaintiff's attempt to characterize such a choice not to exercise the stock option in lieu of the SAR as a *sale* must therefore be rejected.

■ Plaintiff's second contention requires discussion of the economics of the transaction, and its effect on the market. The argument runs as follows: The net result to the executive, upon the exercise of an SAR is the same as if he had exercised a stock option, and then immediately sold enough shares to recover his out of pocket cost in exercising the option and purchasing the optioned shares. Those shares retained would then represent the *profit* realized on the transaction. Any officer or director who followed this procedure of exercising the entire option, immediately selling the cost portion and retaining only the profit portion of the shares, would presumptively be in violation of § 16(b). Since one is left after these transactions with the same number of shares one would have received upon the exercise of an SAR, the exercise of an SAR must, according to plaintiff's theory, therefore involve a purchase of the total number of shares underlying the option and a simultaneous sale of the cost portion of the shares which, when matched together, are violative of § 16(b).

Merely because the net result to the employee is the same as if some other transaction had taken place does not mean that other transactions have in fact occurred. Also, there are important differences between the two situations which plaintiff seems to have overlooked. After the exercise of a stock option, the executive is issued an actual stock certificate representing the optioned shares. Upon obtaining physical possession, he may use the shares as collateral for a loan or he may endorse them and sell or give them away. If sold, those shares will usually be bought by an unrelated third party on the floor of the stock exchange. Such a sale would be

course involve risks and costs and has an income tax effect.

In contrast, upon the exercise of an SAR, the executive does not receive possession of stock certificates representing the total number of underlying shares, and it is overly artificial to claim that the cost portion of the shares are in any way sold back to the corporation. What he does receive is a much smaller number of shares, representing the economic equivalent of the spread, and this is accomplished without risk or cost by a single entry on the books of the corporation and the delivery of the specified number of shares. Furthermore, there is no income tax consequence attributable to the sale of the total number of shares when an SAR is exercised.

The Court rejects this strained attempt to carve up the single SAR transaction by calling it something which it is not. The exercise of a stock appreciation right does not involve the *sale* of an equity security by the officer-director, and thus there is no inherent or *per se* violation of § 16(b) in the exercise of an SAR, as a result of the simultaneous receipt of shares thereunder. *Cf. Rosen v. Drisler*, 421 F.Supp. 1282 (S.D. N.Y.1976).

■ Nor do policy reasons militate in favor of a different result. No reasonable person could argue that § 16(b) read together with the existing SEC rules entirely eliminates the risk of speculative abuse associated with the grant or exercise of stock options. Within the life of the option the executive will always control the timing of his decision whether to exercise or not, and although Exxon has insulated the granting procedure as to officers and directors through the BCC, we are sure that in some corporations the timing for grant of options may not be fully insulated from the wishes and opinions of the insiders. Nor can we say that all speculative abuse vanishes on the morn of the one hundred and eighty-first day.

The rules do, however, reflect a practical and balanced approach to the problem which recognizes the importance of these

employee incentive plans, and yet seeks to minimize the speculative risk by imposing a six-month period both before and after the exercise of the option during which any sale will be deemed to be matched for purposes of § 16(b). Those same policies will be served adequately if the exercise of an SAR be regarded similarly, and treated as a purchase only, of that portion of stock which the officer or director actually receives. Consistency and fairness requires this approach. The risk of speculative abuse is no greater with SARs than the risk associated with the exercise of a typical stock option.[15]

It is important to note in this case that the Exxon directors or officers who exercised SARs have not "cashed in" on any increase in market price, because they received their SAR entirely in stock. Since they all retained the stock for at least six months after the exercise of their SARs they still held the stock at the risk of the market. They could not and did not eliminate the down-side risk. If, as seems logical, one deems the exercise of an SAR to be a *purchase* of the underlying stock received, then there will always be a certain degree of short-term exposure because profits of any *sale* within six months of exercise would be affected by § 16(b).

Exxon has not settled any SARs for officers or directors in cash, as it has the right to do, at its sole option, for ordinary employees. Indeed, it has required payment in cash to the corporation, by those covered by § 16(b) of the withholding tax attributable to the net shares received. This seems to be a recognition that if an SAR was settled entirely for cash, this would constitute a sale, as to the net proceeds received, some or all of which would be subject to § 16(b). This interpretation appears correct, but since no such transaction has taken place, the question is not before us for decision. As presently administered, those at Exxon covered by § 16(b) receive only stock, which,

for purposes of the statute and the rules thereunder, the Court regards as purchased by them on the date the SAR is exercised, at the price per share set forth in the option to which the SAR was appurtenant.

Merely because one who exercises an SAR succeeds in reducing his down-side risk does not necessarily mean that there is an increased likelihood of speculative abuse in connection with that exercise. With respect to both options and SARS, it is only *an exercise and a sale* within the statutory period which presents that clear danger of the in-and-out trading by insiders which the statute seeks to inhibit. As previously noted herein, the SEC has recognized this fact and has recently taken steps to regulate SARs consistently with its existing treatment of options.

Since the exercise of SARs by Exxon officers and directors were not preceded or followed by any sales of stock by them within six months, plaintiff has not sustained the burden of showing a violation of § 16(b) of the 1934 Act. Defendants are therefore entitled to a judgment that all relief be denied with respect to Count Two of the Amended Complaint.

## Count Three: The Common Law Waste or Gift Claim.

Plaintiff asserts that by extending the terms of the qualified options issued in 1968 and 1969 from five to ten years and by adding SARs to most of these options, Exxon's directors made illegal gifts of its assets and committed waste, in violation of various provisions of state corporation law. Furthermore, plaintiff claims that the extension of the lapse period of the options issued to defendant J. Kenneth Jamieson from three months (or less) to one year after normal retirement was made without consideration to the corporation and constituted corporate waste and mismanagement.

---

**15.** Congress has left some of the problems of the abuse of inside information to other remedies. Sanctions such as those imposed by Rule 10b–5 alleviate concern that ordinary investors will not be protected against actual abuses of inside information by officers and directors who are granted stock options and stock appreciation rights. See *Foremost McKesson Inc. v. Provident Securities Co.*, 423 U.S. 232, 255, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).

*Factual Background.*

After the shareholders approved the 1973 Incentive Program in May 1973, the Board Compensation Committee and the COED Committee voted to offer to extend the life of unexercised five-year qualified options issued in 1968 to ten years from the date of issuance. These options were scheduled to expire on December 9, 1973. The Corporation then solicited each 1968 option holder in order to determine who among them wished to have their options extended. These option holders were informed that if extended their qualified options would automatically become non-qualified, and any resulting gain upon the sale or exchange of the stock would be treated as ordinary income rather than capital gain.

On August 6, 1973, when the Board finally voted to extend the terms of these options, the price of Exxon stock was $93. per share and the exercise price of the 1968 option was $83.25. Although 25 employees including eight directors were offered the extension, only 22 (six directors) accepted the offer.

More or less the same procedure was followed in the Fall of 1974 when the granting committees solicited the holders of unexercised five-year qualified options issued on November 26, 1969. All of the 20 employees who held outstanding 1969 options requested and received these extensions. It should be noted that the exercise price of these options was $61.13 per share and that on November 25, 1974, when the final vote was taken, the price of Exxon stock was $59.75 per share.

All options issued under the 1968 and 1973 Plans had a lapse provision applicable after the employee terminated his employment relationship with Exxon. Assuming normal termination due to retirement, options under either Plan were scheduled to lapse one year after such termination or any earlier time set by the grant.

In response to changing tax rulings, the granting committees had in certain cases approved extensions of lapse periods in outstanding options, to allow for exercise up to one year after termination. In particular,

on July 25, 1975, various options covering 36,500 shares held by J. Kenneth Jamieson, Exxon's Chairman of the Board and Chief Executive Officer, were amended to change the lapse period from three months (or less) to one year after his normal termination. Six days later, on July 31, 1975, Mr. Jamieson retired as an employee of Exxon, although he did retain his position as a director. The reason for these extensions was that in May of 1975 Jamieson had sold some of his Exxon stock. Since he was scheduled to retire at the end of July, his options would normally have lapsed at the end of October. However, pursuant to Rule 16b–3, an exercise of an option within six months of a sale would cause recapture of profit under § 16(b). The BCC therefore decided that Jamieson should have an additional period of nine months (up until July 31, 1976) in which to exercise his options and related stock appreciation rights.

Finally, as noted earlier, during the period from March to May 1974, and again in November 1974, SARs were added by amendment to outstanding options held by Exxon employees.

*Discussion.*

In amending the outstanding options the BCC and the COED Committee acted within proper shareholder authority. The 1973 Incentive Plan clearly stated in Section X that:

"A qualified option, which was granted under a shareholder approved stock option plan and has neither been fully exercised nor lapsed, may be amended with the mutual written consent of the Corporation (represented by the granting authority) and the grantee, at any time when the grantee is an employee eligible for a stock option, so as to incorporate in respect of the same number of shares any terms that might have been incorporated in an option granted at the time of the original grant and a stock appreciation right as provided in Section XII."

Since under the 1968 Plan one of the terms which could have been incorporated

into an option at the time of the original grant was a provision for a ten-year life, the granting committees clearly had the requisite authority to extend the five-year qualified options to ten years. Furthermore, even though an option had originally been granted with a lapse period of three months (or less) under both Plans, that option could be amended to provide for a lapse period of up to one year after termination. Section XX of the Plan did contain certain restrictions on the type of amendments which could be made, but none of those prohibitions are applicable to lapse periods or extensions of the life of the option.

 The thrust of plaintiff's contention is that these amendments were gifts of assets, for which the corporation received no benefit or consideration in exchange. The Court does not doubt that these amendments were valuable to the recipients. Yet by extending the term of some of the outstanding 1968–1969 qualified options from five to ten years, the granting committees only gave these employees what they would have been entitled to had they elected a ten-year, non-qualified option at the time of the original grant.

Exxon has administered its program by giving each selected employee above a relatively low base salary a choice as to whether to accept a five-year qualified option or a ten-year non-qualified option. Thus at the time of the grant Exxon stood prepared to award an option with a ten year life. By their services to the corporation, those employees who were selected were deemed to have been entitled to an option of the maximum permissible length. If at the time of the grant, some of these employees for personal, financial, or tax reasons selected only a five-year qualified option, there should be nothing to prevent the employees and the corporation at a later point in time from amending the original contract in order to extend the option for five more years, rather than hold the employee to his original choice.

The same reasoning applies with respect to extending the lapse period after termination. For tax reasons some of Jamieson's options originally had lapse periods of three months or less. While it is true that the lapse periods were extended on the eve of retirement, the extensions only gave Jamieson the maximum of what he would have been entitled to under the 1968 and 1973 Plans.

Finally, accepting plaintiff's theory that the extension of options and lapse periods and the grant of stock appreciation rights on already outstanding options is very beneficial to the recipient and adds new value, it does not follow that those extensions and grants were made without any consideration to the corporation.

 Plaintiff's argument rests on too narrow a view of the consideration requirement in the context of a shareholder-approved, impartially administered stock option plan. These Plans are not defeated by the fact that there is no measurable and definite consideration passing to the corporation. *Beard v. Elster,* 39 Del.Ch. 153, 160 A.2d 731, 735–36 (Del.Sup.Ct.1960). What is controlling is the business judgment of the granting committees, and that of the overwhelming majority of the shareholders who approved these Plans, that providing for stock options and SARs will in the long run spur all employees to greater efforts which can only benefit the corporation. The only limitation on this doctrine is that there must be some adequate assurance in the Plan that makes it reasonable to expect that the Corporation will receive the contemplated benefit, *i. e.,* the services of those key employees who are awarded stock options. 5 W. Fletcher, *Cyclopedia Corporations,* § 2143.1 (Rev.Ed.1967). In this case that assurance comes from the continuity of service provision which requires that stock options are exercisable as to one-half of the shares only after one year of continuous service following the grant, and as to the remaining one-half after two years of such service. While no additional service requirement was imposed by these amendments, it is clear from the record that the great majority of grantees whose options were extended and who received SARs continued to be employed with Exxon follow-

ing these amendments to their options. Thus there was sufficient consideration flowing to Exxon, which was bargaining for, and in fact received, the services of these valuable employees.

■ Nor was the delivery of stock to the officers and directors upon their exercise of SARs a free gift of stock. The exercisable portion of the stock option which is surrendered in connection with the SAR exercise transaction is sufficient consideration received by the corporation. See *Ash v. Brunswick Corp.*, 405 F.Supp. 234 (D.Del.1975); *Kerbs v. California Eastern Airways, Inc.*, 33 Del.Ch. 69, 90 A.2d 652, *pet. for rearg. denied*, 33 Del.Ch. 174, 91 A.2d 62 (Sup.Ct.Del.1952); *Eliasberg v. Standard Oil Co.*, 23 N.J.Super. 431, 92 A.2d 862 (1952), *aff'd without opinion*, 12 N.J.2d 467, 97 A.2d 437 (1953).

■ Furthermore, with regard to extending the lapse period of Mr. Jamieson's options from three months (or less) to one year after retirement, the Court does not adopt plaintiff's view that the extensions were pure and simple gifts to a retiring employee. These extensions were the modern day equivalent of the engraved gold watch which was awarded to a retiring employee in the nineteenth century as a reward for services rendered. The consideration here does not flow solely from Jamieson to the corporation. All that is necessary under the less restrictive view of consideration which is applicable to stock option plans is that there be a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted as an inducement. *Beard v. Elster, supra* at 737. *Eliasberg v. Standard Oil Co., supra* at 872. Exxon receives a benefit not only because of the services which Jamieson is likely to perform in the six days before he retires, but also because the next chief executive officer is likely to work that much harder believing and trusting that when his retirement is imminent, the granting committees will, if necessary, deal with him in equal fairness. Nothing was done for Jamieson outside the scope of the plan; he was merely given the

benefit of the maximum possible lapse period. While these extensions were undoubtedly valuable to him, it was the considered business judgment of the BCC, an entirely disinterested body, that such extensions would be in the best long term interests of the Corporation. Exxon bought an "image" for fair dealing with its other hirelings, and cheaply. Plaintiff has presented no persuasive proof which seriously questions that judgment, and absent any clear showing of fraud or bad faith, it is not for this Court to inquire into the reasonableness of that decision. *Diamond v. Davis*, 38 N.Y.S.2d 103 (Sup.Ct.), *aff'd*, 265 A.D. 919, 39 N.Y.S.2d 412 (1st Dept. 1942), *aff'd*, 292 N.Y. 554, 54 N.E.2d 683 (1944).

*Miscellaneous Matters.*

The Court rejects defendants' suggestion that this litigation is in any way precluded by the failure to enact the resolution proposed by shareholder D. C. Shea at the 1975 annual meeting, which sought to "terminate" the 1973 Plan. Indeed, that argument is regarded as so lacking in merit that further discussion of it would unduly prolong this decision.

All evidentiary rulings and motions to strike as to which decision was reserved are regarded as presenting questions not outcome determinative, and all such evidence has been received and considered.

Also, in denying relief here, we must in fairness observe that this action involves difficult and complex issues of first impression which have been presented, cogently and skillfully by plaintiff and her counsel. In so doing, a valuable service has been rendered in airing these issues. The attorneys for all parties have cooperated with the Court in a responsible manner to make the case ready for trial, and complete all proceedings diligently. While the outcome from plaintiff's perspective is of course disappointing, she and her counsel may have the satisfaction of a worthwhile job well done.

Settle a final Judgment on five (5) days notice.