247 F.2d 689
 Frances B. GREENE and Myron L. Greene, as Executors under the Last Will and Testament of Louis A. Greene, deceased, stockholders of C. I. T. Financial Corporation, suing on behalf of themselves and all other stockholders similarly situated and on behalf of and in the right of C. I. T. Financial Corporation, Plaintiffs-Appellants,
v.
Arthur O. DIETZ, George R. Urquhart, Leo H. Spanyol, C. John Kuhn, L. Walter Lundell, Fred Meissner and C. I. T. Financial Corporation, Defendants-Appellees.
 No. 121.
 Docket 24259.
 United States Court of Appeals Second Circuit.
 Argued January 11, 1957.
 Decided June 7, 1957.
 Rehearing Denied August 12, 1957.
 
 Morris J. Levy, New York City, for plaintiffs-appellants.
 Thomas G. Meeker, Gen. Counsel, David Ferber and Irving M. Pollack, Asst. Gen. Counsel, Ellwood L. Englander, Atty., Securities and Exchange Commission, Washington, D. C., for petitioner amicus curiae.
 Cravath, Swaine & Moore, New York City (Albert R. Connelly, New York City, of counsel), for individual defendants-appellees.
 Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 The appellants, who are stockholders of the C. I. T. Financial Corporation, brought this action under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b), to recover on behalf of that corporation profits alleged to have been realized in the purchase and sale of C. I. T. stock by the individual defendants, each of whom is a director and a regular salaried employee of C. I. T. The action was tried without a jury before Judge Dawson, who entered a judgment dismissing the complaint. D.C.S.D.N.Y.1956, 143 F.Supp. 464.
 
 
 2
 In order to eliminate profits resulting from the use of "inside" information,[1] section 16(b) of the Securities Exchange Act provides for the recovery by a listed corporation of all the profits realized by its directors, officers, or principal stockholders from the purchase and sale, or sale and purchase, within less than six months, of securities in that corporation.[2] In September 1952, the Securities and Exchange Commission amended its own Rule X-16B-3 to exempt from the application of section 16(b) stock acquired pursuant to certain types of stock bonus and similar plans.[3]
 
 
 3
 In 1950 Congress enacted section 130A of the Internal Revenue Code of 1939, formerly 26 U.S.C.A. § 130A, which materially changed the tax consequences to the holders of certain types of stock options when those options are exercised and the stock so acquired is sold. On April 26, 1951, after the enactment of section 130A, the Board of Directors of C. I. T. authorized the appointment of a committee to consider a plan for granting restricted stock options to employees of C. I. T. and its subsidiaries. The proposed plan was approved by the Board and recommended to the stockholders who voted overwhelmingly for its adoption on June 26, 1951.[4]
 
 
 4
 The terms of the plan and the provisions for its administration are set forth in detail in the District Court opinion. See 143 F.Supp. at page 467. We shall therefore mention only those features of the plan and the facts surrounding its administration that are necessary to our disposition of the appeal.
 
 
 5
 The plan provides that options for a limited amount of authorized but unissued common stock of C. I. T. could be granted from time to time prior to August 31, 1956, and that each option is exercisable at any time within five years from the date of granting. Options could be granted only to regular salaried employees of C. I. T. or its subsidiaries. The option price was to be not less than 95% of the fair market value of the stock on the date of the granting of the option.
 
 
 6
 Each of the individual defendants received an option on July 2, 1951. The option price was $19.10 a share, which was more than 95% of the market value of C. I. T. common stock on that date. The alleged profits involved in this litigation resulted from the exercise by the individual defendants of certain of these July 2, 1951 options in 1953 and 1954. The first shares sold were sold on March 20, 1953, the last ones on July 15, 1954. Within six months before or six months after the date upon which he exercised his option, each of the individual defendants sold shares of C. I. T. common stock at a price or prices higher than the option price. Except in one instance in which no profit resulted to one individual defendant, the individual defendants, within less than six months before or less than six months after the date of those sales, did not purchase any shares of C. I. T. common stock other than by the exercise of options granted under the plan.
 
 
 7
 Both at trial and on appeal the appellants urged three principal contentions: (1) that the C. I. T. Plan was not within the general type of stock bonus or similar plan encompassed by the exemptive provisions of SEC Rule X-16B-3; (2) that even if this plan be within the general type so encompassed it did not comply with all the conditions set forth in that Rule; and (3) that the promulgation of amended Rule X-16B-3 exceeds the power and authority of the SEC in that it conflicts with the purposes of section 16(b) of the Securities Exchange Act.
 
 
 8
 Judge Dawson adequately considered and disposed of the first two contentions, and we refer to his opinion for a complete answer to these two arguments presented on appeal.
 
 
 9
 The trial judge also rejected the plaintiff's third contention, expressly finding that "Regulation X-16B-3 of the Commission, as promulgated in September, 1952, was within the power of the Commission." We do not find it necessary to adopt this portion of the opinion below in order to affirm the trial court. Indeed, although not essential to our opinion, we express doubt as to the power of the Commission to promulgate Rule X-16B-3 inasmuch as the Rule's broad language may permit acts by insiders sought to be prevented by the Securities Exchange Act. Nor do we regard the promulgation of the Rule as a matter solely within the expertise of the SEC and therefore beyond the scope of judicial review. Rather, the question is one of interpreting the Securities Exchange Act in order to ascertain whether the Rule was a proper exercise of the authority delegated to the Commission under that Act.
 
 
 10
 This Court said in Smolowe v. Delendo Corp., 2 Cir. 1943, 136 F.2d 231, 240, 148 A.L.R. 300, "Guiding the [Security and Exchange] Commission in the exercise of an actually limited authority is the quite adequate standard * * * that its regulations be consistent with the expressed purpose of the statute. * * The delegation serves no other than the commendable functions of relieving the statute from imposing undue hardship and of giving it flexibility in administration."
 
 
 11
 Is Rule X-16B-3 consistent with the expressed purpose of the statute?
 
 
 12
 The defendants-appellees argue that Rule X-16B-3 is not in conflict with section 16, which was enacted "for the purpose of preventing unfair use of [inside] information." It is the appellees' position that the Rule grants exemptions only in circumstances that do not present the likelihood of misuse of inside information. They point out that, before removing the six months' requirement of section 16(b) from stock acquired through the exercise of employee stock purchase options, the SEC undoubtedly took into account the effect of section 16 (c) of the Securities Exchange Act.[5] That section makes it unlawful for an insider to sell any securities not owned by him in the corporation with which he has an insider relationship. The appellees then argue that section 16(c), by prohibiting "short" sales by insiders, eliminates the most common alleged abuse incident to the issuance of stock purchase options to insiders that existed prior to the passage of the Securities Exchange Act.
 
 
 13
 Before the enactment of section 16(c), insiders who held options to buy stock in a corporation at a fixed price and who possessed information which would substantially affect the market price of that stock, but which had not yet been communicated to the public, could reap profits without investing any capital of their own through well-timed "short" sales of that stock. Although this particular technique of profit-taking from the manipulation of stock options by insiders is prohibited by section 16(c), we can still envision insider trading abuses made possible by the broad exemptions of employee stock purchase options granted by Rule X-16B-3. To illustrate, Director Y of Company X has the right to exercise stock purchase options. Let us assume that Company X announces to the public an impending merger or the negotiation of a large government contract, the news of which stimulates a significant increase in the market price of X's stock. Director Y, with no intention of defrauding the public or the corporation, immediately thereafter exercises his options and acquires a substantial amount of stock in X. Within a short time thereafter Director Y, through access to inside information, learns that the anticipated merger or contract has fallen through. Before this information is communicated to the public, Y sells his recently acquired stock at the market peak. The public is subsequently informed and the market price of X stock declines accordingly. It would seem to us that such an opportunity for profit-taking by insiders in a temporary and artificially stimulated market would be minimized, in accord with the purpose of section 16(b), by a requirement that insiders who acquire corporate stock by the exercise of employee options pursuant to a plan such as that at bar must retain their stock for at least six months after its acquisition or, in the event of their failure to do so, must account to the corporation for the profits resulting from the sale thereof.[6]
 
 
 14
 The defendants argue that it is "improbable" that an option grantee would sell shares within six months after exercising his option because he would thereby lose the favorable tax treatment provided for him by section 130A of the Internal Revenue Code of 1939, now 26 U.S.C. § 421. But the improbability that individual benefits may flow from usurped authority does not make the usurpation any more permissible. The possible inhibiting effects of tax provisions upon the security transactions of insiders is a matter completely apart from that of defining the power of the Securities and Exchange Commission to promulgate a regulation that may permit an abuse sought to be eliminated by section 16(b) of the very Act of Congress that created the Commission for the purpose of enforcing that Act.
 
 
 15
 However, we believe that the following sequence of events justifies an affirmance of the judgment below, for the individual defendants relied on Rule X-16B-3 in good faith and thus are entitled to the protection for persons who so rely that is provided by section 23(a) of the Securities Exchange Act, 15 U.S.C.A. § 78w.[7] Cf. Lockheed Aircraft Corp. v. Rathman, D.C.S.D.Cal.1952, 106 F.Supp. 810. On August 6, 1951, after the first grant of options under the plan, C. I. T. distributed a memorandum to the optionees, including the individual defendants, concerning the applicability of section 16 and the rules and regulations of the Commission then in effect. That memorandum stated that the holder of an option issued under the C. I. T. plan would be subject to liability under section 16(b) if he exercised his option within less than six months after he had sold shares of common stock, or if he exercised his option and within less than six months thereafter sold the same or other shares of common stock, provided that in either case his sales price exceeded the option price.
 
 
 16
 In September 1952, the Commission amended Rule X-16B-3 and the exemptions provided therein were broadened. Subsequently C. I. T. distributed a letter to all its officers and directors stating that in the opinion of the company's counsel the acquisition of common stock upon the exercise of an option granted under the plan was, as a result of the amendment to the Rule, an exempt transaction for purposes of section 16(b). In addition, on November 2, 1953, counsel submitted to the Commission a statement of the relevant facts and requested a ruling thereon. In response, the Assistant Director, Division of Corporate Finance of the Commission, replied as follows by letter dated November 18, 1953:
 
 
 17
 "On the basis of the foregoing facts it would appear that the acquisition of common stock of the corporation pursuant to the Restricted Stock Option Plan for Key Employees comes within Rule X-16B-3. It should be noted, however, that the rule exempts only the acquisition of the securities involved and that sales of such securities are not exempted by the rule. Hence, such sales are within the purview of Section 16(b) of the Act if within six months before or after such sales the director or officer effects other acquisitions which can be matched against them."
 
 
 18
 The individual defendants were advised of this reply. Not until after they had been so advised did they undertake any of the transactions referred to in the complaint. For each individual defendant those transactions included the partial exercise of his option and the sale of other shares of C. I. T. common stock within less than six months before or after the date of that purchase at a price or prices higher than the option price.
 
 
 19
 On these facts we hold that the transactions in issue "would never have occurred were it not for [the defendants'] good faith reliance on" Rule X-16B-3. See Lockheed Aircraft Corporation v. Rathman, supra, 106 F.Supp. at page 814. We emphasize that the defendants' exculpatory reliance was on the rule itself, not merely on the interpretative opinion embodied in the letter from the Assistant Director of the SEC.[8] That letter was only one link in a chain of circumstances evidencing the defendants' good faith reliance on a valid construction of Rule X-16B-3.
 
 
 20
 Judgment affirmed.
 
 
 
 Notes:
 
 
 [1]
 An "insider," as that expression is colloquially used, is defined as follows in section 16(a) of the Securities Exchange Act, 15 U.S.C.A. § 78p(a):
 "§ 78p. Directors, officers, and principal stockholders
 "(a) Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security (other than an exempted security) which is registered on a national securities exchange, or who is a director or an officer of the issuer of such security * * *"
 
 
 [2]
 Section 16(b), 15 U.S.C.A. § 78p(b), reads as follows:
 "(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."
 
 
 [3]
 Rule X-16B-3, with amendments effective as of November 1, 1952, see Securities Exchange Act Release No. 4754, Sept. 24, 1952; 17 C.F.R. § 240.16b-3, reads as follows:
 "Any acquisitions of shares of stock or nontransferable options (other than convertible stock or stock acquired pursuant to a transferable option, warrant or right) by a director or officer of the issuer of such stock shall be exempt from the operation of section 16(b) of the Act if the stock or option was acquired pursuant to a bonus, profit-sharing, retirement or similar plan meeting all of the following conditions:
 "(a) The plan has been approved specifically, or through the approval of a charter amendment authorizing stock for issuance pursuant to the plan, by the security holders of the issuer at a meeting for which proxies were solicited in accordance with such rules and regulations, if any, as were then in effect under section 14(a) of the Act.
 "(b) If the selection of the persons who may receive funds or securities pursuant to the plan, or the determination of the amount of funds or securities which may be so received by any such person is subject to the discretion of any person such discretion shall be exercised by (1) a committee of three or more persons having full and final authority in the matter, or (2) the board of directors of the issuer, provided the members of such committee, or a majority of the directors acting in the matter, are not entitled to participate in such plan or in any other similar plan provided by the issuer or any of its affiliates.
 "(c) The plan effectively limits the aggregate amount of funds or securities which may be allocated with respect to each fiscal year pursuant to the plan, either by limiting the maximum amount which may be allocated to each participant in the plan or by limiting the maximum amount which may be so allocated to all such participants.
 "(d) The acquisition of the securities pursuant to the plan does not involve the payment of any cash (other than the application of funds currently received pursuant to the plan or payable pursuant to the option contract) directly or indirectly, to the issuer or any of its affiliates."
 
 
 [4]
 The validity of the plan and the options granted thereunder, as well as the procedure followed for its adoption, have been sustained in the Delaware Court of Chancery, Kaufman v. Shoenberg, 1952, 33 Del.Ch. 211, 91 A.2d 786, and in the United States District Court for the District of Delaware, 1954, 154 F.Supp. 64
 
 
 [5]
 Section 16(c), 15 U.S.C.A. § 78p(c), insofar as here relevant, provides:
 "(c) It shall be unlawful for any such beneficial owner, director, or officer, directly or indirectly, to sell any equity security of such issuer (other than an exempted security), if the person selling the security or his principal (1) does not own the security sold * * *"
 
 
 [6]
 The application of a six months' retention requirement to a stock option plan such as that here in issue would not work a "hardship." See Smolowe v. Delendo Corp., supra, 136 F.2d at page 240, 148 A.L.R. 300. To be sure, if under the terms of a stock bonus plan a participant receivedannual awards of stock, all profits from the sale of such stock would be recoverable under section 16(b) as long as the seller continued to participate in the plan because he would always have "purchased" securities within six months before or after his sale. See Truncale v. Blumberg, D.C.S.D.N.Y.1950, 88 F.Supp. 677, 678, affirmed sub nom. Truncale v. Scully, 2 Cir., 1950, 182 F.2d 1021; Loss, Securities Regulation, p. 591 (1951). But here no such hardship is compelled by the terms of the option plan because the options are not granted on a fixed periodic basis, and they are exercisable at any time within five years from the date of granting.
 
 
 [7]
 Section 23(a), 15 U.S.C.A. § 78w(a), reads as follows:
 "(a) The Commission and the Board of Governors of the Federal Reserve System shall each have power to make such rules and regulations as may be necessary for the execution of the functions vested in them by this chapter, and may for such purpose classify issuers, securities, exchanges, and other persons or matters within their respective jurisdictions. No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission or the Board of Governors of the Federal Reserve System, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason."
 
 
 [8]
 See Loss, Securities Regulation, p. 1097 (1951), p. 379 (Supp.1955), and discussion therein
 
 
 
 21
 CLARK, Chief Judge (concurring).
 
 
 22
 I concur in Judge WATERMAN'S closely reasoned opinion in its entirety, including his expression of doubt as to the power of the SEC to promulgate Rule X-16B-3. This doubt must arise when the rule is viewed against the statute and the Congressional purpose as we have often declared it since its first expression now generally accepted as authoritative in Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, 148 A.L.R. 300, certiorari denied Delendo Corp. v. Smolowe, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446. I would feel it unnecessary to add anything except that a late suggestion for appeal to the Commission or other delaying steps makes some statement of our court practice desirable.
 
 
 23
 Whatever value or validity the suggestion might otherwise have (a matter discussed below), we think it should be denied in any event here because it is so late. The appeal was argued on January 11, 1957; because of some of the difficulties under which this court has labored during recent months, decision was necessarily delayed for four months, although the opinion has been available for filing since early in May. The Judicial Conference of the United States holds that delay in decision of appeals under submission for more than three months is a matter calling for formal explanation. Rep. of Proceedings of a Spec. Sess. of the Jud. Conf. of the U. S., March 14, 15, 1957, p. 6. While we cannot hope, in view of the exigencies we face, to equal the unusual record for expedition of our predecessors in this court, we certainly should do what we can to avoid unnecessary delays. And the suggestion here coming at the end of a crowded year and calling for certain difficult adjustments of inquiry and approach would mean a delay in all probability of six to nine months, particularly if oral argument were to be contemplated. Such delay for determining not the decision, but the form and mold in which its supporting rationale is to be cast, seems too large a price to pay, particularly when other and more direct courses, such as a motion for rehearing, are at hand to achieve all that can be hoped for.
 
 
 24
 Even more than other appellate courts, this court has welcomed the assistance of the SEC as an amicus curiae; in some matters indeed, such as allowances to counsel, it has deferred extensively to the Commission's conclusions. Scribner & Miller v. Conway, 2 Cir., 238 F.2d 905; Finn v. Childs Co., 2 Cir., 181 F.2d 431. So far as I can recall, however, we have never taken the initiative in appealing to the Commission, but have gladly accepted its aid when furnished either in the trial court or by brief or argument in this court. There is good ground for our restraint; for the course followed allows the Commission and the parties to frame their issues and to meet them where the facts and the law can best be developed and where any gaps in the material can be closed. The advantage of this presentation can be perceived here if we turn to a consideration of the nature of the appeal we should need to make. If we endeavored to enter upon a full explanation of premises and doubts, we would undoubtedly disagree as to what we should say and confuse by what we might ultimately venture. If we did not do this, what could we ask other than whether or not the Commission considered its own regulation valid? And the mere suggestion points the way to the difference between a case such as that of allowance to counsel acting under the Commission's observation and this, which deals with statutory purpose, where we have already spoken and where the Commission's changing personnel cannot have either the same responsibility or the same expertise as in the other.
 
 
 25
 There is another important consideration, namely, that this is a situation where the Commission should have freedom of choice as to the time and character of the advice it should tender to the judiciary. Judging by our observations from experience, there is little doubt but that the Commission has had this very case under careful consideration from the beginning and will seek to intervene when and as and to the extent it deems necessary. It may well be embarrassed to receive requests from appellate courts around the country to give advice which for reasons the inquiring courts may not know or appreciate is not feasible or sound policy under the circumstances. In former cases involving these "short-swing" profits we have expressed some regret that Commission advice has not been tendered us or the trial court, Blau v. Mission Corp., 2 Cir., 212 F.2d 77, 81, certiorari denied Mission Corp. v. Blau, 347 U.S. 1016, 74 S.Ct. 872, 98 L. Ed. 1138; Roberts v. Eaton, 2 Cir., 212 F.2d 82, 84, certiorari denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652; we understand that even these quite mild suggestions were disturbing to the Commission, which, perhaps because of shortage of personnel or other good reasons unknown to us, was unable to act. At any rate we have not pursued even this minor lead; thus we sought no such help in the very important case of Magida v. Continental Can Co., 2 Cir., 231 F.2d 843, certiorari denied Continental Can Co. v. Magida, 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490.[1] Hence even had the suggestion here been timely, I think we should properly await the Commission's own decision as to action, rather than force it to possibly unpleasant choices.
 
 
 
 Notes:
 
 
 [1]
 In Stella v. Graham-Paige Motors Corp., 2 Cir., 232 F.2d 299, certiorari denied Graham-Paige Motors Corp. v. Stella, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52, we noted and followed its briefamicus curiae filed much earlier in the district court, as noted in 1952, Stella v. Graham-Paige Motors Corp., D.C.S.D.N.Y., 104 F.Supp. 957, 959.
 
 
 
 26
 LUMBARD, Circuit Judge (concurring and dissenting).
 
 
 27
 While I concur in the result, I must dissent from so much of Judge WATERMAN'S opinion as expresses a "doubt as to the power of the Commission to promulgate Rule X-16B-3 inasmuch as the Rule's broad language may permit acts by insiders sought to be prevented by the Securities Exchange Act." I agree with what Judge Dawson has written at 143 F.Supp. 472-473.
 
 
 28
 Obviously the Securities and Exchange Commission concluded in 1952 that there was little, if any, danger that such acts by insiders would result from the Rule. Nor is there anything before us by way of fact or argument to indicate that any such danger has actually materialized or that subsequent events have made it more likely that it might materialize, although we are advised that such plans have been adopted by hundreds of corporations as a matter of sound business policy for the benefit of all their stockholders.
 
 
 29
 In these circumstances it seems hardly fitting for judges relatively untutored in such matters to substitute their judgment for the expert determination of the Securities and Exchange Commission. Unless and until there is a clear showing that the Commission has opened a door which Congress meant to keep shut, I would leave it to the Commission and the Congress to administer and legislate thereon respectively. On the record before us these are matters for executive and legislative action rather than by judicial interference.
 
 
 30
 Furthermore, I would suppose that at the very least we are bound to give the benefit of any doubt to the expert judgment of the Commission on matters which the Congress has confided to the Commission's regulation. Drafting and supervising the operation of such a rule obviously requires the Commission to weigh many factors, and this involves the kind of assessment which is difficult enough for experts. We should be guided by these principles, which have been expressed by the Supreme Court many times. See, e. g., Board of Trade of Kansas City v. United States, 1942, 314 U.S. 534, 548, 62 S.Ct. 366, 86 L.Ed. 432; National Broadcasting Co. v. United States, 1943, 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344; and Securities and Exchange Commission v. Central Illinois Securities Corp., 1949, 338 U.S. 96, 127, 69 S.Ct. 1377, 93 L.Ed. 1836. "[B]y virtue of its delegation of power to promulgate legislative rules Congress has shown its intent that the determination of the content of the rules should be made by the agency and not by the courts." Davis, Administrative Law, 901 (1951).
 
 
 31
 In my opinion there is no basis in this record for an expression of any doubt as to the validity of Rule X-16B-3.
 
 
 32
 As these considerations have not prevailed, I have urged my colleagues to invite the Commission to express its views. I regret to report that they have rejected this suggestion.
 
 
 33
 On Petition for Rehearing.
 
 
 34
 PER CURIAM.
 
 
 35
 Although neither appellant nor appellee sought a rehearing in this case, the Securities and Exchange Commission timely filed an application with us seeking our permission to file a petition, amicus curiae, for a rehearing. We readily granted such permission. The Commission represents to us that our opinion of June 7, 1957 should be clarified to remove any uncertainties with respect to our beliefs as to the validity of SEC Rule X-16B-3 (17 C. F. R. 240.16b-3). We are grateful to the Commission for the interest it has shown, and we order that the brief offered by it in support of its petition be filed and made a part of the records in the case. The petition and brief demonstrate that the Securities and Exchange Commission understands, without further clarification, the content of our opinion. We learn therefrom that it is re-evaluating its Rule X-16B-3. In the meantime, pending any modification of the Rule after such re-evaluation, it would seem that any reliance upon it by persons entitled to exercise stock purchase options under employee stock option plans substantially similar to that here in issue would be ill-advised.
 
 
 36
 The petition for rehearing is denied.
 
 
 37
 LUMBARD, Circuit Judge (dissenting).
 
 
 38
 The petition for rehearing filed by the Securities and Exchange Commission should be granted; we should hold Rule X-16B-3 to be valid.
 
 
 39
 The Commission's brief reinforces my original view that not only is the Rule clearly valid but that in any event, the majority's doubts as to its invalidity, which really amount to a holding of invalidity, should be based on more than a possibility of abuse as supposed and conjectured by judges.
 
 
 40
 As the Commission points out, the question we must ask is not whether isolated instances of abuse may result from this exemption, but whether the Commission was reasonable in deciding that "the possibility of the use of inside information * * * appeared slight by comparison with the interference by the statute with legitimate trading." Memorandum of Securities and Exchange Commission, Amicus Curiae, page 5. As the Commission further points out, the majority's approach which looks only to whether any abuse is possible, writes the Commission's rule-making power out of the statute for almost any exemption will permit some possibility of abuse. To put the matter in another way, it may hardly be said as to any exemption that some abuse is not possible.
 
 
 41
 This balancing of the desirability of some exemption against the likelihood of its abuse is a function of the Commission and, unless clearly unreasonable and irrational, is not the function of judges. Therefore a decent respect for the powers and duties of an administrative agency should impel us to exercise our powers — here the power of a dictum — with some humility and self-restraint.
 
 
 42
 I would grant the rehearing and hold Rule X-16B-3 to be valid.