COLEMA REALTY CORPORATION

v.

**Rolf D. BIBOW, Stillman B. Brown, Richard Coar, Francois Jaulin, Frank W. McAlbee, Jr., William Missimer, Jr., Nathaniel B. Morse, Donald Nigro, Peter L. Scott, Dale W. Van Winkle, Arthur Wegner, George E. Williams, Charles B. Preston, Raymond D'Argenio, Joseph A. Biernat, Ralph A. Weller and United Technologies Corporation.**

Civ. No. H–82–430.

United States District Court,
D. Connecticut.

Feb. 9, 1983.

---

* Exhibit A, which can be found at 554 F.Supp. 1080, has been deleted for publication purposes.

Morris J. Levy, Levy & Levy, New York City, for plaintiff.

Ralph C. Dixon, Day, Berry & Howard, Hartford, Conn., Arnold Bauman, Shearman & Sterling, New York City, for defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

CLARIE, Senior District Judge.

This case is presently before the Court on the defendants' Motion for Summary Judgment and involves a series of stock transactions which were engaged in by several executive officers of United Technologies Corporation ("UTC"). The plaintiff brings this stockholder's derivative action under Section 16(b) of the Securities Exchange Act of 1934 to recover the profits of these transactions for the corporation. The defendants claim that the stock transactions complained of are within an exemption from § 16(b) provided by Rule 16b–3 of the Securities and Exchange Commission. The parties have stipulated to the essential facts

of the stock transactions and the Court finds that summary judgment is appropriate in this case.

The Court finds that the exemption provided by Rule 16b-3 was not applicable to the stock transactions in this case, because certain amendments to the stock option plan were adopted by the corporate Board of Directors and had not been approved by shareholders of UTC. However, the Court finds that the defendants cannot be held liable for the profits because they participated in these stock transactions in good faith reliance on the rules and regulations of the Securities and Exchange Commission.

### Facts

On April 13, 1976, the stockholders of UTC approved a Common Stock Option Plan (hereinafter "Option Plan").[1] It provided for the issuance of a maximum of 1,500,000 shares of UTC common stock to be used for options granted pursuant to the terms of an Option Plan. The stated purpose of the Plan was to afford officers and key employees an opportunity to obtain a proprietary interest in the success of UTC by granting them options to purchase common stock of UTC at a stated fixed amount.

The price for each share purchased under the stock option was stated in the Plan as being not less than 100% of the fair market value of the common stock on the day of the option grant. The Plan expressly directed that the option price be paid in full at the time of the purchase, and that the proceeds received from the sale of common stock pursuant to the Option Plan would be used for general corporate purposes.

Each of the individual defendants were granted options pursuant to the Option Plan during the period from April 13, 1976, to February 16, 1978. On the date the individual options were granted, the recipient of the option (the "optionee") and UTC executed a standard agreement entitled "Non-Qualified Stock Option Agreement",[2] which contained the express terms and conditions for the grant of the stock option and its exercise. Paragraph Three of the Agreements expressly provided that upon exercise of the option, payment shall be made "with funds in United States dollars in an amount equal to the option price of the shares to be purchased."

On September 22, 1980, the Board of Directors of UTC adopted certain amendments to the 1976 Option Plan.[3] The amendments became effective on September 29, 1980, *without any prior notification or approval of the shareholders of UTC.*

---

1. The United Technologies Corporation, 1976 Common Stock Option Plan provided for the grant of options to purchase common stock to officers and key employees of the corporation selected by the Committee on Compensation of the Board of Directors. The full text of the Option Plan is set forth in the Affidavit of Arnold Bauman, December 14, 1981, (hereinafter "1981 Bauman Affidavit") Exhibit B.

2. Copies of the Non-Qualified Stock Option Agreements signed by the defendants are annexed to the Affidavit of Morris J. Levy, August 10, 1982, Exhibit 2.

3. Paragraph 5(a) of the Option Plan entitled "Option Price", was amended to include the following at the end of the paragraph:
   "Payment of the option price may be made in cash (U.S. dollars) or, in the case of a Nonqualified Option, by exchange of Common Stock of the Corporation or partly in cash and partly by exchange of such Common Stock, provided that (i) a minimum of 100 shares of the Common Stock of the Corpora-

tion are surrendered in each exchange and (ii) Common Stock surrendered shall be valued at its fair market value on the date of exercise."
Paragraph 9 entitled "Use of Proceeds" was deleted in its entirety, and Paragraph 11, entitled "Certain Definitions" was amended to include the following:
   "and (c) fair market value as used in this Plan, unless the context otherwise requires, shall mean the closing price of the Corporation's Common Stock, or other security for which such fair market value is being determined, as reported by the Consolidated Tape of New York Stock Exchange listed shares (or such other reporting system as shall be selected by the Board upon recommendation of the Committee) on the relevant date or, if no sale of the Corporation's Common Stock, or such other security, shall have been reported for that day, on the next preceding day for which there was such a reported sale."

These amendments substantially modified the terms of the Option Plan by providing that the consideration to be paid to UTC, upon the exercise of the option, could be either in cash or in shares of UTC's common stock. If shares of stock were used as consideration, a minimum of 100 shares was required and the shares would be valued at the current market value on the date of exercise of the stock option. The amendments also entirely deleted that portion of the Option Plan which specified that the proceeds of the sale of stock under the Option Plan would be used for general corporate purposes.

Two recent developments in the law apparently prompted the adoption of these amendments to the UTC Option Plan. On April 27, 1979, the Internal Revenue Service ("IRS") issued a ruling which held an employee could deliver stock already owned by him as payment for the exercise of an employee stock option without recognizing any taxable gain on the unrealized appreciation of the tendered shares.[4] Pursuant to this ruling, the optionee is not taxed on the difference between his cost basis for the old shares and their market value on the date of delivery, even though the delivered shares are valued at their current market price for purposes of paying all or part of the option price. In a private letter dated March 11, 1980, the IRS notified the UTC Tax Department that the 1976 Option Plan, if amended to permit payment upon exercise in either cash or previously owned stock, would permit optionees to avoid recognition of gain on previously owned shares delivered as payment of a stock option.[5]

The other recent development came from the Securities and Exchange Commission (SEC), which adopted an amendment to its own rules providing for exemptions from Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). This Section provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

SEC Rule 16b-3 further provides an exemption from § 16(b) for certain transactions occurring pursuant to employee benefit plans. The SEC amended Rule 16b-3 effective September 29, 1980, to extend the exemption to both:

"the surrender or delivery to the issuer of shares of its stock as payment for the exercise of a stock option for shares of the same class; and the acquisition upon the exercise of a stock option equal to the number of shares of the same class surrendered or delivered to the issuer as

---

**4.** *See* 1979 Stan.Fed.Tax Rep. (CCH) ¶ 6979.

**5.** *See* 1981 Bauman Affidavit, Exhibit C.

payment for the exercise of the option." 17 C.F.R. § 240.16b-3.

Therefore, under Rule 16b-3 as amended, the delivery of shares of stock as payment for the exercise of a stock option would not be considered a "sale" and the acquisition of option shares equal to the number of shares surrendered in exchange would not be considered a "purchase" for purposes of § 16(b).

UTC notified its executives of the recent amendments to the Option Plan and the IRS ruling and encouraged the optionees to exercise their options "now or in the future with less depletion of personal cash reserves and without borrowing and incurring consequent interest charges."[6] The sixteen individual defendants concerned were all holders of stock options under the Option Plan and they exercised their options on various dates between October 1, 1980, and July 14, 1981. They each began by surrendering the required minimum of 100 previously owned shares, valued at the current market price, and received in exchange a comparable value of an increased number of option shares. The number of the option shares received always exceeded the number of previously owned shares surrendered, because the option price was always substantially less than the current market price. Each of the defendants then repeated this process in a series of simultaneous transactions by surrendering the shares received in the prior exchange and receiving, in turn, an ever-increasing number of shares until his entire option was exhausted. The plaintiff has accurately characterized this process as "pyramiding of shares", because the initial investment of 100 shares, followed by several successive exchanges, ultimately yielded a return of thousands of shares for the optionee.

A summary of the transactions engaged in by one of the defendants, Rolf D. Bibow, will be helpful to illustrate the mechanics and mathematics involved in these transactions. On April 13, 1976, Mr. Bibow was granted an option to purchase 10,000 shares at the then current market price of $29.95 per share. On November 14, 1980, following the amendments to the Option Plan, Mr. Bibow decided to exercise his option and surrendered 100 shares of previously owned UTC common stock, which had a current market value of $62.00 per share. Thus, the total value of the 100 shares surrendered by Mr. Bibow was $6,200.00. In exchange for the 100 shares surrendered, (plus $29.60 in cash to account for a fractional share) Mr. Bibow received 208 options shares ($29.95 × 208 = $6,229.60). On the same day, Mr. Bibow surrendered the 208 shares thus received, at the current market price, for additional option shares. This time Mr. Bibow exchanged 208 shares plus $12.45 in cash for 431 option shares. Immediately thereafter, the 431 shares plus $23.35 in cash were exchanged for 893 shares. After three more simultaneous transactions, Mr. Bibow had entirely exhausted his option to purchase 10,000 shares. At the conclusion of the transactions on November 14, 1980, Mr. Bibow had surrendered a total of 4,829 shares and paid $102 in cash in exchange for 5,271 shares of UTC common stock.

Before Mr. Bibow exercised his option to purchase the 10,000 shares the actual economic value of his option could be characterized as the "spread", that is, the difference between the total option price of the 10,000 shares and the total market price of the 10,000 shares. As previously stated, the option price was $29.95 per share for a total option price of (10,000 × $29.95) $299,500.00. The market price of UTC stock on November 14, 1980, was $62.00 per share for a total market price of (10,000 × $62.00) $620,000.00. Thus the spread, or actual economic value of Mr. Bibow's option was ($620,000.00 minus $299,500.00) $320,500.00.

The net result of the transactions by which Mr. Bibow exercised his option reveals that the total value of the shares and cash surrendered (4,829 shares at $62.00 per share, plus $102.00 in cash) equals the op-

---

6. *See* Affidavit of Arnold Bauman, March 17, 1982 (hereinafter "1982 Bauman Affidavit").

Exhibit I, Letter of September 23, 1980.

tion price of $299,500.00. The *net* increase in Mr. Bibow's shares of 5,171 shares (5,271 shares minus the 100 shares previously owned and originally surrendered) had a total market value of $320,602.00, which is equal to the spread of $320,500.00 plus the $102.00 in cash paid by Mr. Bibow. The transactions thus enabled Mr. Bibow and the other defendants to instantly receive the spread, or actual value of their stock option in shares of UTC stock without making any further paid-in cash investment, except for the fractional share adjustment.[7]

### Discussion of the Law

◼ The plaintiff has brought this shareholder's action pursuant to § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), and seeks to recover for UTC the profits realized by the defendants from these transactions. The defendants do not dispute that they are officers of UTC subject to the provisions of § 16(b). The defendants do contend, however, that the stock transactions at issue in this case are specifically exempted by SEC Rule 16b-3, 17 C.F.R. § 240.16b-3.[8] The validity of this rule has been disputed in previous cases, *see e.g., Greene v. Dietz*, 247 F.2d 689, 692 (2d Cir.1957), and the plaintiff has challenged the authority of the SEC to promulgate Rule 16b-3 as it is now written. It is not necessary for the Court to decide whether

**7.** Although the defendants initially surrendered 100 shares of previously owned stock at the outset of the transactions, the total shares received at the end of the transactions were equal to the spread *plus* the 100 shares initially surrendered and thus no initial investment was required.

**8.** SEC Rule 16b–3, as far as is relevant to this decision, reads:

"§ 240.16b–3. Exemption from section 16(b) of certain transactions occurring under employee benefit plans.

The following transactions by a director or officer shall be exempt from the operation of section 16(b) of the Act if they occur pursuant to a plan which satisfies the conditions of this rule: the acquisition of shares of stock, except that stock acquired upon the exercise of an option, warrant or right shall be exempt only to the extent indicated in the final clause of this sentence; the acquisition, expiration, cancellation or surrender to the issuer of a stock option or stock appreciation right; the surrender or delivery to the issuer of shares of its stock as payment for the exercise of a stock option for shares of the same class; and the acquisition upon the exercise of a stock option of shares of stock equal to the number of shares of the same class surrendered or delivered to the issuer as payment for the exercise of the option. The conditions of this rule that a plan must satisfy in order for the above transactions to be exempt are as follows:

(a) *Approval by security holders.* The plan has been approved, directly or indirectly, (1) by the affirmative votes of the holders of a majority of the securities of the issuer present, or represented, and entitled to vote at a meeting duly held in accordance with the applicable laws of the state or other jurisdiction in which the issuer was incorporated, or (2) by the written consent of the holders of a majority of the securities of the issuer entitled to vote: *Provided, however,* That if such vote or written consent was not solicited substantially in accordance with the rules and regulations, if any, in effect under section 14(a) of the Act at the time of such vote or written consent, the issuer shall furnish in writing to the holders of record of the securities entitled to vote for the plan substantially the same information concerning the plan which would be required by the rules and regulations in effect under section 14(a) of the Act at the time such information is furnished, if proxies to be voted with respect to the approval or disapproval of the plan were then being solicited, on or prior to the date of the first annual meeting of security holders held subsequent to the later of (i) the first registration of an equity security under section 12 of the Act or (ii) the acquisition of an equity security for which exemption is claimed. Such written information may be furnished by mail to the last known address of the security holders of record within 30 days prior to the date of mailing. Four copies of such written information shall be filed with, or mailed for filing to, the Commission not later than the date on which it is first sent or given to security holders of the issuer. For the purposes of this paragraph, the term 'issuer' includes a predecessor corporation if the plan or obligations to participate thereunder were assumed by the issuer in connection with the succession. In addition, any amendment to the plan shall be similarly approved if the amendment would:

(A) Materially increase the benefits accruing to participants under the plan;

(B) Materially increase the number of securities which may be issued under the plan; or

(C) Materially modify the requirements as to eligibility for participation in the plan."

Rule 16b-3, in its present form, exceeds the rule-making authority of the SEC because the Court finds that the express conditions contained in the Rule were not met and therefore the exemption provided by Rule 16b-3 does not apply.

Rule 16b-3 provides an exemption from § 16(b) for certain transactions by directors and officers if they occur pursuant to a plan which satisfies the conditions of the Rule. The first express condition of the Rule requires that the plan be approved "by the affirmative votes of the holders of a majority of the securities of the issuer . . . ." The Rule also requires that "any amendment to the plan shall be similarly approved if the amendment would: (A) Materially increase the benefits accruing to participants under the plan . . . ."

It is not disputed that the original Option Plan was submitted to, and approved by the shareholders of UTC. The Option Plan approved by the shareholders, however, expressly provided that the option price be paid in full upon exercise of the option, and the proceeds of such sales would be used for general corporate purposes. The amendments to the Option Plan that were adopted by the Board of Directors of UTC on September 22, 1980, without any prior notification or approval of the shareholders, altered the method of payment upon the exercise of a stock option and entirely deleted the provision regarding the use of the proceeds.

The Option Plan originally approved by the shareholders contemplated payment in cash for the 1,500,000 shares issued pursuant to the Option Plan. Under the Option Plan as amended by the Board of Directors, the option holders were able to fully exercise their options in a series of simultaneous transactions, as described earlier, and the only consideration received by UTC was the return of a portion of the option shares. The central issue is whether this amendment to the Option Plan by the Board of Directors *materially* increased the benefits accruing to participants under the plan.

The concept of materiality is a familiar one in federal securities law and particularly in the context of solicitation of share-

holder votes. Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and the regulations promulgated thereunder specifically prohibit the misstatement or omission of any material fact in the solicitation of shareholder votes. Rule 16b-3 requires that shareholder approval of a stock option plan be solicited in accordance with Section 14(a). 17 C.F.R. § 240.16b-3(a). Accordingly, the Court will apply the standard of materiality as developed under Section 14(a) to determine whether the amendments to the UTC Option Plan conferred benefits upon participants that were material in nature.

In *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the Supreme Court enunciated the proper standard for materiality under Section 14(a).

"An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." 438 U.S. at 449, 96 S.Ct. at 2132.

Applying the standard to this case, the amendments to the UTC Option Plan would require shareholder approval if there is a substantial likelihood that a reasonable shareholder would consider them important in deciding how to vote.

A reasonable shareholder who voted on the Option Plan as it was originally proposed would have been aware that the Option Plan required full payment of the option price upon exercise of a stock option. The shareholders could reasonably expect that the cash proceeds from the sale of 1,500,000 shares at the option price, as determined, would have contributed a substantial amount of working capital for general corporate purposes. The original Option Plan fixed the option price at no less than 100% of the current market price on the date the option was granted. Thus, even though the market price might climb much higher than the fixed option price, the shareholders could be assured that the corporation would not be conferring a gratuity upon its executives who were participants in the Option Plan. The express require-

ment of full payment upon exercise of a stock option would also have indicated to a reasonable shareholder that it was unlikely that all of the 1,500,000 shares issued under the Option Plan would be sold.

The amendments to the Option Plan by the Board of Directors, in conjunction with the recent amendments to SEC Rule 16b-3 enabled the optionees to pyramid their shares in the manner described and substantially changed the operation of the Option Plan. It is highly unlikely that shareholders would expect that the Option Plan they adopted could be amended, without their consent, to allow participants to dispense with requirement of cash payments altogether and still be able to fully exercise all of the granted options. It is obvious that a reasonable shareholder, if given the opportunity, would have considered these changes important in deciding how to vote.

The SEC, however, has stated that amendments to an existing option plan, which provide for the acceptance of previously owned stock in payment for the exercise of a stock option, merely alter the form of consideration required and would not be considered material for purposes of Rule 16b-3(a). The SEC has stated that such an amendment to an existing stock option plan need not be submitted to shareholders for approval under Rule 16b-3. *See* SEC Release No. 34–16770, April 30, 1980, 45 Fed. Reg. 29853; SEC Release No. 34–17080, August 28, 1980, 45 Fed.Reg. 57389; SEC Release No. 34–18114, September 23, 1981, 46 Fed.Reg. 48147.

▬▬ The Court is acutely aware of the legal principle that the interpretation of a regulation or statute by the regulatory agency charged with administering it is given considerable deference by federal courts. *Perine v. William Norton & Company, Inc.,* 509 F.2d 114, 120 (2d Cir.1974). (SEC interpretation of exemption provided in Rule 16b-2 given considerable weight). An administrative agency's interpretation of its own regulations is given controlling weight, unless it is inconsistent or plainly erroneous.

*Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964). The facts of this case, however, demonstrate that the amendment to the Option Plan enabled participants to "pyramid" their shares and instantly receive the full amount of the spread in stock without any investment. This is far more than a mere alteration of the consideration required and in fact operates to eliminate the need for consideration altogether.

The SEC has addressed the issue of pyramiding of shares in its Interpretative Release discussing Rule 16b–3. SEC Release No. 34–18114, September 23, 1981, 46 Fed. Reg. 48147, Question (92).

"(92) *Question:* In delivering already owned shares to satisfy the exercise price of a stock option, can the optionee also use the shares received upon such exercise to satisfy the exercise price of additional options?

*Answer:* Yes. The optionee can use any shares of the same class that are in his possession. However, the so-called 'pyramiding of shares' is not contemplated by Rule 16b-3. Under this technique, the optionee requests the issuer to automatically apply the shares received upon the exercise of a stock option to satisfy the exercise price for additional options. The effect of pyramiding, at least in theory, is to allow the optionee to deliver a relatively small number of shares in satisfaction of the exercise price of even the largest option. In amending Rule 16b-3 to provide an exemption in connection with the exercise of stock options, the Commission did not intend that this relief would extend to the practice of pyramiding." (Footnote omitted).

While the SEC has recognized the evils of pyramiding, it has apparently failed to fully evaluate the mischief that can result from an amendment to a stock option plan, which allows for payment upon exercise in previously owned stock, thus permitting the

technique of pyramiding to be accomplished, as in this case.[9]

The SEC has indicated that certain amendments to a stock option plan would in fact confer material benefits on optionees and would require shareholder approval to comply with Rule 16b-3(a). The SEC has stated that an amendment, which would provide for the grant of stock appreciation rights, would confer material benefits on participants and would require shareholder approval. SEC Release No. 34–18114, September 23, 1981, 46 Fed.Reg. 4817, Question 100(a). Stock appreciation rights give the optionee the right to receive, either in cash or stock, the increase in the value of the optioned shares from the date of the grant of the option to the date of the exercise of such rights.[10] The exercise of a stock appreciation right cancels the underlying option and the optionee immediately receives the benefit of the spread between the option price and the market price. The SEC has ruled that an amendment to an option plan which confers stock appreciation rights must be approved by the shareholders, because "a stock appreciation right would not merely change the type of consideration which could be delivered, but would instead eliminate the need for delivery of any consideration at all." SEC Letter to Anheuser-Busch Companies, Inc., February 20, 1981, 1981 Fed.Securities Law Reports (CCH) ¶ 76,838.

The facts of this case demonstrate that the technique of pyramiding of shares enabled the defendants to receive, in stock, the increase in the value of the optioned shares, exactly as if they had been granted stock appreciation rights. The defendants here ultimately received, in stock, the value of the spread between the option price and the market price of their stock options and did so without making any capital investment (except for the original 100 shares and the minimal cash payment required to round-out the fractional shares). The Court can find no substantive distinction between an amendment granting stock appreciation rights and an amendment allowing for payment with previously owned shares, upon the exercise of a stock option. The different treatment given by the SEC to these two techniques is therefore inconsistent and plainly erroneous.

The Court finds, as a matter of law, that the amendment to the Option Plan which enabled certain option holders to provide payment in either cash or stock, conferred benefits on the option holders that were material in nature and enabled them to pyramid their shares. Since this material amendment to the Option Plan, adopted by the corporate Board of Directors, was not approved by the shareholders, the exemption from § 16(b) pursuant to Rule 16b-3 was not available to the defendants in this action.

The Supreme Court held in *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), that certain "unorthodox" transactions[11] not clearly within the purview of § 16(b) require that courts "inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based on access to inside information ...." 411

9. The Court has carefully considered the informal SEC rulings contained in the private letters annexed as Exhibits E through H to the 1982 Bauman Affidavit. In essence, the private letters indicate that the pyramiding of shares condemned in Answer to Question (92) would occur *only* if the optionee could receive and retain the total number of shares covered by the option. Because pyramiding of shares requires successive exchanges wherein the optionee surrenders some option shares to receive more shares, it is practically and mathematically impossible for an optionee to retain *all* of the shares covered by the option. These letters demonstrate the confusion and ambiguity surrounding the SEC interpretation of Rule 16b–3 and provide further support for refusing to follow the Commission's interpretation.

10. *See Matas v. Siess,* 467 F.Supp. 217 (S.D.N.Y.1979); *Freedman v. Barrow,* 427 F.Supp. 1129 (S.D.N.Y.1976). (Stock appreciation rights and § 16(b) liability considered).

11. The term has been applied to dealings in options, rights and warrants. *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 593 n. 24, 93 S.Ct. 1736, 1744 n. 24, 36 L.Ed.2d 503 (1973).

U.S. at 594, 93 S.Ct. at 1744. "In interpreting the terms 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 600 n. 4, 30 L.Ed.2d 575 (1972).

The defendants had independent, voluntary control over the timing of the exercise of their stock options, confined only by the expiration dates of the options. The pyramiding technique enabled the defendants to instantly receive the spread between the option price and the then current market price of their stock option. They could decide to exercise their option when they knew, by virtue of their status as corporate insiders, that the spread was at its maximum point. This aspect of voluntariness gives rise to the opportunity for speculative abuse which § 16(b) was designed to prevent. *Matas v. Siess,* 467 F.Supp. 217, 221 (S.D.N.Y.1979); *cf., Kern County Land, supra,* 411 U.S. at 600, 93 S.Ct. at 1747.

The defendants rely on *Freedman v. Barrow,* 427 F.Supp. 1129 (S.D.N.Y.1976), which held that the exercise of a stock appreciation right for stock only, rather than for cash, did not provide the opportunity for speculative abuse prohibited by § 16(b). In *Freedman,* even though the defendants could instantly receive the spread between the option price and the market price, the court found that where they received the spread in shares of stock, which they could not sell for at least six months, there was no violation of § 16(b).

The *Freedman* case is distinguishable because the court there refused to find that an exercise of a stock appreciation right involved both a purchase and a sale. The transactions here involved automatic and simultaneous stock exchanges which the Court finds include both purchases and sales. Here, the defendants initiated their transactions by surrendering to the corporation 100 previously acquired shares at the current market price, which constituted a "sale" within the meaning of § 16(b). Divestment of securities in exchange for other securities is an exchange within the purview of § 16(b). *Newmark v. RKO General, Inc.,* 425 F.2d 348, 355 (2d Cir.), *cert. denied* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). The defendants acquired option shares pursuant to this initial exchange and these option shares are deemed to have been purchased on the date the option was exercised. *Silverman v. Landa,* 306 F.2d 422 (2d Cir.1962); *Levy v. Seaton,* 358 F.Supp. 1 (S.D.N.Y.1973).

The fact that the defendants only received shares of stock, which they must continue to hold for six months, does not eliminate the opportunity for speculative abuse. If a corporate insider exercises a stock option by pyramiding his shares on a day when he knows, by virtue of inside information, that the spread is at its highest point, he will receive the maximum number of shares his option could yield. If the market later drops, he will be in a far better position than if he had delayed exercising his option, because he will own more shares than he later could have obtained.[12]

The defendants argue that in the event the Court does find that their transactions were violative of § 16(b), they should be immune from liability because they engaged in the transactions in good faith. Section 16(b) is a strict liability statute, which requires that all profits realized on "purchases" and "sales" within the specified time period be disgorged without proof

---

12. Consider the following simplified example: A corporate insider holds an option to purchase 1,000 shares at $10.00 per share when the market price is $20.00 per share. The spread between the total option price and the total market price is $10,000.00, and by the technique of pyramiding his shares the insider would receive 500 shares if he exercised his option at that time. Later, when some adverse news becomes public, the market price declines to $15.00 per share. The spread is then only $5,000 and the optionee can only obtain 333 and ⅓ shares by pyramiding. If the optionee acted to exercise his option before the news became public, he could acquire 500 shares, which would later decline in value to $15.00 per share, but would still be worth more than the 333 and ⅓ shares he could acquire if he delayed.

of actual abuse of insider information, and without proof of intent to profit on the basis of such information. *Foremost-McKesson v. Provident Securities,* 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976); *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 595, 93 S.Ct. 1736, 1745, 36 L.Ed.2d 503 (1973); *Newmark v. RKO General, Inc.,* 425 F.2d 348, 353 (2d Cir. 1970). Because the Court has found that the transactions do give rise to the opportunity for speculative abuse, the intent of the defendants is irrelevant. *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 424 n. 4, 92 S.Ct. 596, 600 n. 4, 30 L.Ed.2d 575 (1972).

■ The defendants try to fit their actions into the narrow exception recognized in *Greene v. Dietz,* 247 F.2d 689, 694 (2d Cir.1957), and based on Section 23(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78w(a). The statute reads, in relevant part:

"No provision of this chapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission or Board of Governors of the Federal Reserve System, notwithstanding that such rule or regulation may, after such act or omission, be amended or rescinded or be determined by judicial or other authority to be invalid for any reason."

In *Greene,* before any of the contested transactions occurred, legal counsel for the company requested and received a ruling from the SEC regarding the applicability of the exemption provided by Rule 16b-3. The SEC ruled that the exemption would apply in a private letter to the company's counsel dated November 18, 1953. The defendants

in *Greene,* did not engage in any stock transactions until *after* they were advised of the SEC ruling. On these facts the court found that the defendants' good faith exculpated them from liability. 247 F.2d at 695.

Here, UTC sought the advice of reputable legal counsel concerning this method of exercising stock options in September of 1980, before the amendments to the Option Plan were adopted by the Board of Directors. Legal counsel advised that the transactions would be exempt from § 16(b) pursuant to Rule 16b-3. The individual defendants did not exercise their stock options until after they were advised by the President of UTC that the transactions were exempt from § 16(b).[13] *See* Letter of September 23, 1980, 1982 Bauman Affidavit, Exhibit I.

The SEC had previously ruled that shareholder approval would not be required for the adoption of an amendment to a stock option plan that would allow for payment, upon the exercise of a stock option, with previously acquired shares. *See* SEC Release No. 34–16770, April 30, 1980, 45 Fed. Reg. 29853; SEC Release No. 34–17080, August 28, 1980, Fed.Reg. 57389. Under Section 23(a), the defendants could rely on the published SEC rulings listed above, with impunity, until the SEC or a federal court ruled otherwise. *Greene v. Dietz,* 247 F.2d 689 (2d Cir.1957); *Van Aalten v. Hurley,* 176 F.Supp. 851 (S.D.N.Y.1959).

The Court finds that the defendants acted with good faith reliance on SEC rules and regulations and are immune from liability pursuant to Section 23(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78w(a).[14] Accordingly, the defendants' Motion for Summary Judgment is granted.

SO ORDERED.

---

13. The SEC Interpretative Release No. 34–18114 which condemned the practice of pyramiding was not issued until September 23, 1981, and all of the transactions involved here were completed by July 14, 1981. The private letter rulings discussed earlier, *supra* at n. 9, were all issued after September of 1981, and thus could have no bearing on the defendants' good faith reliance.

14. If the defendants were not entitled to the defense based on Section 23(a), the profits recoverable by the issuer might be strictly limited by the operation of SEC Rule 16b–6, 17 C.F.R. § 240.16b–6. *See Steinberg v. Sharpe,* 95 F.Supp. 32 (S.D.N.Y.1950) (Medina, J.), *aff'd,* 190 F.2d 82 (2d Cir.1951); *Levy v. Seaton,* 358 F.Supp. 1 (S.D.N.Y.1973). This Rule was not addressed by the parties and in light of the availability of the defense under Section 23(a),

the question of its applicability will not be reached.